ASHLAND OIL, INC., Appellee,
Cross-Appellant,

v.

PHILLIPS PETROLEUM COMPANY,
Appellant,

v.

UNITED STATES of America,
Intervenor-Appellant.

Nos. 73-1797, 73-1798 and 73-1799.

United States Court of Appeals,
Tenth Circuit.

Jan. 27, 1975.

On Rehearing En Banc May 10, 1977.

Richard B. McDermott, Tulsa, Okl. (Lloyd G. Minter and Don L. Jemison, Bartlesville, Okl., with him on the brief), for appellant.

Gerald Sawatzky, Wichita, Kansas (Jay W. Elston, Houston, Texas, John M. Imel, Tulsa, Oklahoma, Arloe W. Mayne, Ashland, Kentucky, W. O. Strong III, Houston, Texas, and Foulston, Siefkin, Powers & Eberhardt, Wichita, Kansas, Fulbright, & Jaworski, Houston, Texas, and Martin, Logan, Moyers, Martin & Conway, Tulsa, Oklahoma, of Counsel, with him on the Brief), for Appellee, Ashland Oil, Inc.

Floyd L. France, Atty., Department of Justice, Washington, D.C. (Peter R. Taft, Asst. Atty. Gen., Washington, D.C., Nathan G. Graham, U.S. Atty., Hubert A. Marlow, Asst. U.S. Atty., Tulsa, Okl., E. Edward Johnson, U.S. Atty., Topeka, Kan., Jon K. Sargent, Asst. U.S. Atty., Edmund B. Clark, Dennis A. Dutterer, George R. Hyde, and Jacques B. Gelin, Attys., Department of Justice, Washington, D.C., with him on the Brief), for Intervenor-Appellant, United States of America.

Before LEWIS, Chief Judge, BREITEN-STEIN, SETH, McWILLIAMS, BARRETT and DOYLE, Circuit Judges, sitting en banc.

SETH, Circuit Judge.

This action was brought to recover the reasonable value of helium intermixed with natural gas, extracted therefrom, and sold by the defendant Phillips to the United States. The plaintiff prevailed against the defendant and the Government as intervenor in the lower court, and they both appeal. Plaintiff also appeals, but only as to the ultimate division of the proceeds derived from the helium as ordered by the trial court.

The case was commenced in the Southern District of Texas, but transferred at defendant's request to the Northern District of Oklahoma. The complaint asserts jurisdiction based on diversity and this ground was established. The Government intervened as plaintiff, but was realigned as a defendant.

The general description of the occurrence of helium, its characteristics, and how it became an issue is described in the several opinions hereinafter cited. It is, however, necessary to describe the contractual relationship which existed between the defendant Phillips and the Bureau of Mines during the pertinent time period as it bears on the relationship with plaintiff.

The Helium Act (50 U.S.C. § 167 et seq.) was directed to the conservation of helium present in natural gas and which was being wasted by the use of the gas as fuel. It was determined that the best method to prevent this loss was to intercept the flow of helium-bearing natural gas after it had been gathered and where large volumes were being transported by pipeline to the fuel consumers, and to extract the helium therein intermingled. At these points the pipeline companies had possession of the gas stream.

The Bureau of Mines pursuant to the Helium Act entered into contracts with those in possession of the natural gas stream to purchase helium after it was extracted from the stream. The record shows that this decision to contract apparently was brought about by the inability of the Bureau to then ascertain the identity of the interest owners in the helium and to deal with them within any reasonable time. The Bureau indicates that there were some 30,-000 landowners involved and several hundred lessee-producers of the gas. The production is from several states and the interest owners reside in many different states. By the contracts with the defendant and others the Bureau made possible the construction of extraction plants and soon came into possession of the helium so removed from the large gas stream. Waste of the helium was so prevented, and the purpose of the Helium Act was accomplished.

We are here concerned with the Government contract with defendant Phillips whereby the helium was physically acquired by the Government, but the ownership and compensation problems were put off to another day. The Bureau thus used by this contract the advantageous position of one in possession; postponed the inevitable legal problems, and placed itself in the position of a defendant when the problems came before a court.

In the contract between the United States as buyer and the defendant as seller covering the purchase of helium, a specific amount was provided as compensation to defendant. The record shows that this figure was arrived at by comparison of the estimated cost to the Government had it built its own plant. No relationship of this figure to any then market values was developed in the record. This was a base price of $10.30 per Mcf and was subject to escalation under Paragraph 7.3. Paragraph 7.4 provided that in addition to such amount the buyer would pay to the seller the amounts " . . . that Seller shall pay subsequent to the date of this contract . . . to parties other than itself . .

for the acquisition of helium in the natural gas . . . or for any interest therein." It provided that such payments to qualify would have to be made with the consent of the buyer, and that "consent" included claims that " . . . have been judicially determined in favor of any claimants by any Federal Court or the highest appellate court of any state," and payments made in accordance with the findings, principles, and conclusions of such "judicial determination." Under the contract formula the defendant would pay the first $3.00 per Mcf to third parties and the Government would pay the rest. The result would be that the ultimate payment to the "owners" was to be so shared by defendant and the United States, with the United States providing an indemnification for required payments above the stated amount. There are other qualifications also.

It is obvious that this litigation wherein compensation is demanded by the interest owners of the helium was contemplated and was provided for in the contract. It was apparent that some knotty legal problems would have to be met in order to determine who the interest owners were, and to decide whether or not they had already been compensated for the helium under the leases, the gas purchase contracts, or the Natural Gas Act. These postponed legal problems were in large part decided in the *Consolidated Helium Cases* (*Northern Natural Gas Co. v. Grounds*, 441 F.2d 704 (10th Cir.)), opinion by Judge Breitenstein. The basic legal relationships among the landowners, producers, and gas purchasers were there established, as was the relationship of the Natural Gas Act and the Helium Act. The controlling rules were set in the *Grounds* opinion, en banc consideration was denied, and the Supreme Court denied certiorari, 404 U.S. 951, 92 S.Ct. 268, 30 L.Ed.2d 267. We decline to reconsider *Grounds*. Further, in *Grounds* we held that " . . . the lessee-producers are entitled to the reasonable value of the contained helium." The problem of the amount of reasonable compensation, and who should pay, was not decided in *Grounds*, and was remanded to the trial court. The *Grounds* case is again

before this court en banc and was consolidated for hearing with this case, but is not considered in this opinion.

When the matter of compensation is in issue we are faced with a somewhat different aspect of the physical and legal journey helium makes from the natural gas well to the storage facilities of the Bureau of Mines than we have considered before. The possession and interception of the gas stream, the separation of the helium therefrom, and its delivery to the United States under the contract arrangement are all still important, but the relationship of the contracting parties to those who now have been determined to own interests in the helium, and of course, the value of the helium are the center of focus.

The position of the United States as a party herein is somewhat unusual. It filed a motion to intervene as a party plaintiff with a "Complaint in Intervention of the United States" attached. This motion was granted. The complaint of the Government stated that the court had jurisdiction under 28 U.S.C. § 1345, cited 28 U.S.C.A. § 2201, and recited the existence of the contract for the purchase of helium from Phillips, asserted that Phillips had delivered to the United States "large quantities of a helium-gas mixture" for which it had been paid "substantial sums of money." This complaint acknowledges that the plaintiff Ashland is seeking "fair market value" of helium in the gas it sold to Phillips which was processed for helium, and the helium in turn sold to the United States under the contract referred to above. The Government further alleges that Ashland has already been paid for the helium content along with the hydrocarbons, and in any event the value of the helium content is "nominal." The complaint asserts that: "An actual controversy exists between the United States and Ashland as to whether payments between Phillips and Ashland for the gas as produced was payment for the helium content." The Government also asserts that it " . . . has a real and substantial interest in this litigation because of a provision in its contract with Phillips un-

der which it may be under a duty to indemnify Phillips for additional payments . . . ." The Government prayed for a determination that Ashland had already been paid in full, and if not, that the fair market value of the helium was "nominal." Phillips and Ashland answered the Government's complaint. Ashland in its answer prayed for costs and general relief.

As the trial opened, the attorney for Phillips suggested that the United States be realigned as a party defendant. The court then said: "The Court will order that the style be changed to Ashland Oil and Refining Company, Plaintiff, versus Phillips Petroleum and United States of America as defendants." The findings recite that at the Government's request it was aligned as a defendant and was an intervenor. The United States participated in the trial, cross-examined witnesses, put on a witness of its own, objected to the plaintiff's findings, and submitted proposed findings. The judgment entered ran against Phillips only. The United States has fully participated in this appeal.

As indicated above, this action was brought by Ashland against the defendant Phillips to recover the reasonable *wellhead value of helium commingled with the FPC jurisdictional Gas,* but separated at defendant's plants constructed pursuant to the Helium Act and delivered as "conservation helium" to the Bureau of Mines. The suit was tried within the holding of Northern Natural Gas Co. v. Grounds, 441 F.2d 704 (10th Cir.) (*The Consolidated Helium Cases,* or *Grounds* ).

On this appeal Phillips devotes much of its brief and argument to contentions which were advanced in *Grounds,* there considered and rejected. It would serve no purpose to again consider these arguments. Instead it is sufficient to refer to the *Grounds* opinion for the disposition of these points.

It must be accepted that the "value" sought to be determined in this suit is basically a factual matter determined through the application of the appropriate legal doctrines. This is the value at the wellhead of

the helium commingled with the natural gas there being produced.

The appellants here urge as a basic error by the trial court that it chose the wrong method in arriving at this "value." The trial court determined that there was no prevailing market value for the commingled helium, there was no free competitive market for this helium at the wellhead. The court thus used a market value for the ultimate product less the cost of beneficiation of the helium-bearing gas. The defendants urge that the trial court had sufficient evidence before it of a "market value" of the commingled helium at the wellhead.

The defendants, on their "market value" theory, put on testimony and exhibits as to transactions concerning helium-bearing gas wherein a value was ascribed to the helium component. These described events covered a broad time span and a wide geographical distribution. They involved both governmental agencies and private parties.

■ The trial court, in holding that there was no free competitive market, held that these transactions were of no probative value because they were not comparable. It thus concluded that the evidence failed to establish a "market price" by comparable sales. We reach the same conclusion. The transactions described by the witnesses for the defendant were too remote in time or place, and otherwise could not be considered as comparable. The testimony did not show a free market condition to establish a usable price. It is apparent that the gas stream here concerned with all its components was directed by the FPC, and was locked in by the jurisdictional gas. There was not an opportunity for free pricing at any point, nor for renegotiation of sales or the negotiation with new purchases. The helium thus had to go along with the stream. The purchasers of the stream here concerned, of course, took the position that they owned the entire contents, and were not required to pay anything more. This litigation demonstrates the character of the market, the Government domination of the market, and the strength of bare possession.

In the market price evidence of the defendant, considerable detail is presented as to purchases at the several Government helium plants. These include the plants at Exell, Otis, Cunningham, and Navajo. The helium purchases or gas purchases at these plants were made during World War II. The years which have passed since "The War" would seem to cast more than a doubt that these could possibly be comparable sales. The purchases at the Navajo plant were renegotiated after the War in 1955 and 1959, but again this cannot be a comparable transaction. The stream from the Rattlesnake production had no use as a fuel. It did have a high helium content, but nothing is developed as to any other market for this gas. The Government had for all practical purposes a monopoly on sales of helium until about 1962.

There was also testimony as to purchases of gas by the Government for the Keyes plant in 1958. The price was somewhere near $2.00 per Mcf. The production costs at this plant were about $15.50 per Mcf. The basic interest of the seller was to make the residue gas marketable by raising the BTU. The seller also assumed liability for possible additional payments to third parties.

The Otis plant was also used to upgrade the gas for fuel purposes by separating out the noncombustible portions of the stream.

Phillips also introduced evidence as to several *contracts* it had made for the payment for components of the gas production purchased. Some mentioned helium, some did not. This was a dollar price in some, and a formula as for all other components in others. These are not of particular significance, especially the casinghead gas contracts, because there was no evidence that the casinghead gas contained helium nor was ever processed for helium. As to the other Phillips contracts, there was no showing that the gas had a helium content at all (with insignificant exceptions), nor that there was ever a remote possibility of extraction, again with insignificant exceptions. Contractual provisions in such a context, even where helium was mentioned, are a meaningless gesture of the parties, and

cannot be considered as evidence of comparable *sales.*

The Gas Sales Agreement between Colorado Interstate and Alamo Chemical Company (a Phillips affiliate or subsidiary) was put in evidence. This provided for the processing of gas produced in Morton County, Kansas, for the removal of helium and liquefiable hydrocarbons. The plant operator was to pay $2.00 per Mcf for helium extracted at the plant. This price was not negotiated, and it seems reasonable to assume that this was because there was litigation pending as to the obligations to pay for helium involving the parties. The contract limited the sellers' liability on the title warranty of helium to $2.00 per Mcf. There was no contract provision for payment for hydrocarbons removed. This contract must be considered for all practical purposes as a post-litigation contract. There was also in evidence a gas exchange agreement between Phillips and Pioneer Natural Gas Company. This had a price for helium but there were other contractual considerations such as delivery of gas at other locations, and payment for only part of the helium. This agreement cannot be considered as a comparable sale.

The testimony of the defendants and evidence was thus directed to "other sales" in other places and other times. There was no substantial showing that these were "comparable sales." Evidence of "other sales" falls far short of establishing a market without comparability being clearly established.

█ In addition to the evidence relating to particular contract provisions, and some sales, there was expert testimony. The plaintiffs and defendants had expert witnesses who testified as to what the value of helium should be. This testimony produced by both sides is of theoretical interest, presents a facet of the entire conservation program, and a description of the few independent private enterprises which tried to enter the field. No matter how interesting, this evidence is only opinion evidence, and does not establish facts. This testimony comes well down on the scale of acceptable evidence as to value. It is obvious that comparable sales or current market price is the best, and second would come the work-back method. The expert testimony of the type here presented would come somewhere after that. The experts were extremely capable, experienced persons who gave well considered and conscientious expression of their opinions, but nevertheless it remained opinion evidence on a matter of objective facts.

We thus must agree that the trial court was correct in seeking an alternative method to "market price" for establishing the reasonable value of the helium component at the wellhead. It is obvious that the comparable sales-current market price is by far the preferable method when it can be used. However, it cannot be used when the elements necessary for its proper application are lacking. The trial court thus had to resort to a work-back method or price less costs of beneficiation. This was a less desirable method but perfectly valid. Under this method a point was selected where there can be determined an established price and the costs of processing or beneficiation were deducted to move back to the place where the value must be established.

The work-back valuation is well recognized in the production and early processing of natural gas. It is commonly used, according to this record, in placing a value on feed stock for gasoline plants and related processing. There is nothing unusual about the method, it is subject to proof, and can be just as accurate as any other method, but it is more difficult to apply. There is here concerned a single plant constructed and operated for the specific purpose of extracting helium. Other costs, and other elements, can be established. This work-back method was used by the Government and the Court of Claims in making payment to the Navajos for gas supplied to the Navajo Helium Plant. *See Navajo Tribe v. United States,* 364 F.2d 320, 176 Ct.Cl. 502. The Government has used it on other occasions such as for Kerr-McGee royalty payment in Arizona, and under different circumstances. As to the work-back as a

method for valuation *see also* Brown, Law of Oil and Gas Leases, § 6.09; *Harding v. Cameron*, 220 F.Supp. 466 (W.D.Okl.); and Sneed, 25 Tax L.Rev. 641. This method to establish value has not only been used in the petroleum industry, but also in other natural resources cases. *See United States v. Wyoming*, 331 U.S. 440, 67 S.Ct. 1319, 91 L.Ed. 1590; *Black Crystal Coal Co. v. Garland Coal & Mining Co.*, 267 F.2d 569 (10th Cir.); and *Greer v. Stanolind Oil & Gas Co.*, 200 F.2d 920 (10th Cir.). *See also* the gasoline plant case, *Freeland v. Sun Oil Co.*, 277 F.2d 154 (5th Cir.), which is a common use in the industry.

Phillips argues that its right to acquire the helium component was covered by its contracts, and neither the Helium Act nor the Natural Gas Act altered these contracts. Thus there was a Fifth Amendment violation if its property was "given" to another. This court on the *Grounds* case really decided this issue and there would seem to be no need to consider it again other than to state that Phillips acquired the whole stream or production, but has only paid for part. We said in *Grounds*, "In our opinion private contract law and the principles applicable thereto are not controlling." Apparently the Government has yet to pay Phillips for much of it also.

The appellant next argues that the value less expense method was not only inapplicable, but it was improperly applied in that the proof was deficient as to certain elements, that mistakes were made, and that "trifling recognition" was given to certain evidence. We will take these references to mean that there was not substantial evidence on the several factors or elements of the method of valuation.

As to the several elements, the appellants urge that the amount used as the "return on investment" expense was not sufficient. The trial court used a figure which was part of the testimony of plaintiff's witnesses, and the method by which it was arrived at was so presented. There was no substantial contrary evidence presented at trial although on appeal appellants assert deficiencies in the method.

This element however was not adequately developed by the proof and further hearing is required on this element.

The appellants also object to the allowance made by the trial court of $2.00 per Mcf for the "treatment" of the "crude" helium sold to it by Phillips (to be incurred by the Government before resale), as insufficient in that it did not include transportation and storage. Matters of expense to be incurred subsequent to the delivery and perhaps some transportation from place of delivery to the underground storage are not shown to have been omitted from the $2.00 figure although it was denominated a "treatment" or "processing" cost. In any event, these costs are more properly attributable to the general conservation program as the duration of the storage and additional transportation are unknown factors under the record. The use of the deduction was proper and appellants have not shown that it was not supported by substantial evidence.

The trial court used a figure of $20.00 per Mcf for the selling price of helium, and this was the starting figure or element of the value less expense method. This figure was testified to by the witness for the plaintiffs; this price issue was not met by defendant by way of proof. On remand the validity of this figure must be examined by the trial court, and a determination made again as to the proper starting value.

The Government, in an argument again based on condemnation doctrine, urges that the helium values were *created* by its own purchase program—The Helium Conservation Program, and it should not have to pay for such values. It cites several condemnation cases on this point, and *United States v. Fuller*, 409 U.S. 488, 93 S.Ct. 801, 35 L.Ed.2d 16, which in turn cited *United States v. Cors*, 337 U.S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392. This again concerned payment for something requisitioned by the Government. The issue here is the determination of value of a commodity which was purchased and sold by the Government and by private concerns. It was a stockpiling of a commercial product. This cannot be

equated to the cases where the condemnation or the reason for condemnation increases the value of the land taken. The helium has value by reason of its nature and usefulness. The Government may have made this helium available but did not create its value.

The appellants vigorously attack the use by the trial court of the value of hydrocarbon liquids produced at the helium plants in the value less expense calculations. The trial court allocated part of the plant expense to these liquids as by-products. The evidence is unclear that an increase in the production of liquids would result from the helium plant operation over what had been experienced before and over ordinary extraction plants. Appellants maintained that the increase in liquid production did not result at all from the treatment of the gas stream for helium extractions. The record shows that increased quantities of wet gas were directed to at least one of the plants, and this could make a difference in the production of liquids, but no figures were produced by defendants. Under this state of the record, we must hold that the trial court did not have adequate data to this element. Different quantities of liquids were produced at different plants, and this may result in different helium values at different plants. In view of the evidence, this was a consequence of the application of the expense element in the formula. However, further evidence on this aspect is needed.

■ The Government makes the point that the value of helium at the wellhead determined by the trial court exceeds the base figure for the helium-nitrogen mixture it was buying from Phillips under its contract. This may be a consequence of the decision, but there is no reason why the wellhead price should be determined by the contract price. This payment was not necessarily the "price" of the helium as other considerations were present. The contract between the appellants was negotiated between them alone, and the pricing was the evaluation by them of the entire economic consequences of the transaction including many significant factors such as its duration, warranties, and indemnities. We have described the contract at the outset of this opinion. Attention should however be directed again to the evaluations made of the legal questions, especially the title questions. The Government agreed basically to pay Phillips for its interest in the helium and then to pay more if other interest owners established their claims. This has been done, but the price "paid" for all the interests in the helium has not yet been determined. The value here sought to be established is independent of the contract base amount, and is to be of all interests of the proper parties.

We have considered *Lippert v. Angle*, 211 Kan. 695, 508 P.2d 920. It states the traditional preference for comparable sales proof with which we agree, but the case does not involve the separate valuation of helium. The plant was very small, and the situation is not comparable in any way. *See also Greenshields v. Warren Petroleum Corp.*, 248 F.2d 61 (10th Cir.).

This appeal also raises issues as to the allowance of prejudgment interest, attorney fees, and the matter of limitations. The trial court tried the case as a federal question case, relying on our opinion in *Texaco Inc. v. Phillips Petroleum Co.*, 481 F.2d 70 (10th Cir.), which was thereafter reversed by the Supreme Court in *Phillips Petroleum Co. v. Texaco Inc.*, 415 U.S. 125, 94 S.Ct. 1002, 39 L.Ed.2d 209. That case was concerned only with federal question jurisdiction under 28 U.S.C. § 1331(a), and not whether state or federal law controls. The United States was not there a party. Federal jurisdiction is here conceded.

The original *Consolidated Helium Cases* were based on federal interpleader jurisdiction, and also federal law was applied. The case before us on this appeal started as a diversity suit, and the Government has asserted a claim or an interest. We have described at some length above the participation of the United States in this action, especially the initial intervention as a plaintiff expressly under 28 U.S.C. § 1345. It is apparent however that its alignment at all

times was with the defendant Phillips on all important issues. No relief was sought by Ashland directly against the United States. The trial court found the elements of a condemnation or seizure by the United States, but this analysis of the manner in which helium was acquired was considered in the *Consolidated Helium Cases*, and the arguments were rejected.

■ As a matter apart from jurisdiction, we hold that the trial court's application of federal law was proper. The action of the Government in entering the case as a plaintiff under 28 U.S.C. § 1345 is a significant factor to be considered. The real party in interest thus appeared formally to challenge the claims of Ashland. The Government so asserted that it had a real and substantial interest in the litigation, and that an actual controversy existed between it and Ashland. It is apparent that under the contractual arrangement, the United States undertook to pay to Phillips the amounts that Phillips "shall pay" to other parties for the acquisition of helium in the natural gas above a certain figure. This is in the nature of an indemnity agreement and the contract contains qualifications and limitations not here concerned. The United States is liable for some of the additional amounts which Phillips will have to pay. The Government has thus entered the litigation to assert its own position and interest under the contract. This is initially a matter of dollars, but the Government still has possession of a large part of the helium in question, and this possession can put a somewhat different cast on the problem. These circumstances and the intervention could very well have changed the action to something other than the usual diversity suit at least for the purpose of the application of *Erie v. Tompkins.* This has interesting possibilities, but in any event, the circumstances direct that federal law be applied.

As indicated above, and as demonstrated in *Northern Natural Gas Co. v. Grounds,* 441 F.2d 704 (10th Cir.), and by the record here, the Government in the several cases before this court is faced with claims made by a multitude of interest owners from many states relating to production from Kansas, Oklahoma, and Texas. Each state has somewhat different legal doctrines relating, among other things, to the nature of interests in oil and gas, and what rights are created by oil and gas leases. With the primary liability for the dollars, and for the determination of ownership resting with the United States which obtained possession of the helium, we hold that the application of the rule expressed in *Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838, is indicated. One of the most significant factors is the one indicated above, that is, the fact that the United States ended up with the helium. It directed, by contracting, the diversion of the helium to itself before resolving the obvious ownership problems with a multitude of claimants having diverse legal relationships to the helium, depending upon the place where the natural gas was produced and upon their contractual positions. The United States, again by contract, sought to handle these problems by providing for reimbursement to Phillips, and it may have done so. The Government nevertheless obviously has the basic responsibility and liability, as it recognizes by its intervention.

*Erie v. Tompkins* does not demand the application of state law to all diversity actions. The Court in the *Clearfield Trust* case set out an exception which was there applied to "obligations" of the United States and later expanded. The case concerned the forgery of a Government check, and a delay in notice by the Government to the bank beyond the period contemplated under state law. The Court held that rights of the Government relating to commercial paper it issues are determined by federal and not state law. The Court said that the authority to issue the check in question originated in the Constitution and statutes of the United States and was not dependent on the laws of any state. In the matter before us, the helium was acquired by the United States by contracts as authorized by federal statutes. This contracting with private enterprise was suggested by statute. As stated by the Court in the cited

case, "The desirability of a uniform rule is plain." *See also National Metropolitan Bank v. United States,* 323 U.S. 454, 65 S.Ct. 354, 19 L.Ed. 383, limited by *Bank of America v. Parnell,* 352 U.S. 29, 77 S.Ct. 119, 1 L.Ed.2d 93. The War Bond cases in state and federal courts lead to the same result. *See In re Stanley's Estate,* 102 Colo. 422, 80 P.2d 332. The Court in *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956, also indicated a considerable area to be excluded from the application of *Erie.* There an action by the FDIC was brought on a note given to a bank by the defendant, and the Court applied federal law. Also in the shareholders' liability action in *Holmberg v. Armbrecht,* 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743, in the solution of a limitations problem, the federal law was applied. Generally, *see* 59 Harv.L.Rev. 976, and 105 U.Pa.L.Rev. 797.

■ Under *Clearfield* when the United States seeks to litigate or seek a remedy arising from transactions it has entered into in the ordinary commercial world to carry out its program, it has been held that federal law may be applied. The federal courts can adopt a governing rule of law in such circumstances if there is no statutory direction to the contrary. *Clearfield* expressly so held. 318 U.S. at 366, 63 S.Ct. 573. *See also United States v. Allegheny County,* 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209. *Clearfield* thus indicates that the Court may apply state doctrines or parts of them as "federal law." In *United States v. Standard Oil Co.,* 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067, the Court stated that the interests of the Government and its legal relationships may be so determined. The impact of the application of state law upon the governmental interests is a factor of great weight. *See United States v. Mitchell,* 403 U.S. 190, 91 S.Ct. 1763, 29 L.Ed.2d 406.

The Court in *United States v. Little Lake Misere Land Co.,* 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187, considered the application of a Louisiana statute to the reservation of a mineral interest in land acquired by the United States. The factors discussed above were there treated, and the process was described as a "choice of law" (federal or state) matter. The Court there said:

"However, in a setting in which the rights of the United States are at issue in a contract to which it is a party and 'the issue's outcome bears some relationship to a federal program, no rule may be applied which would not be wholly in accord with that purpose.'" [The quotation included being from Mishkin, 105 U.Pa.L. Rev. at pp. 805–6.]

The Court found further that the federal land acquisition program in *United States v. Little Lake Misere Land Co.* conflicted with the state law on the duration of reserved mineral interests, and said: "The choice of law merges with the constitutional demands of controlling federal legislation; we turn away from state law by default."

In the case before us, the United States was seeking to carry out the Helium Conservation Program then considered of great urgency and importance. It sought to, and did, acquire possession of the helium as directed by the legislation. The action of the Bureau of Mines was efficient and effective. In so doing it set up the contractual barriers between itself and the landowners and gas producers, and also put off the inevitable day of reckoning as to ownership. Phillips is really only a nominal party and looking at the substance, the Government has the responsibility arising from its acquisition and possession of the helium. In the face of the multitude of claimants, the variations in state law, and the *Clearfield* doctrine, the trial court was correct in not applying *Erie v. Tompkins.*

■ We find no merit to the contention of Phillips that it is entitled to a setoff for any sums previously paid to Ashland for purchases of jurisdictional gas.

■ The court in the *Consolidated Helium Cases* considered the ownership of the interests, title to the helium, and described how these passed down the gas stream. This determination prevails. The trial court, as to the interest of the landowners-lessors, apparently followed a confiscation-

condemnation theory and divided the value of the helium to be recovered from defendant Phillips equally between the lessors and lessees. Our opinion in the *Consolidated Helium Cases* requires that this division be in accordance with the lease terms, and thus the same division as applied to the hydrocarbons. The judgment of the trial court making an equal division between lessor and lessee of the proceeds attributable to helium values must be and is reversed with directions to enter judgment providing for a division in accordance with the terms of the leases, and the terms of other agreements relating to the shares of production, or payment for shares of production, if such be applicable.

■ The issue of limitations has been raised together with the tolling of whatever statute may be applicable. This litigation concerning the property interests in helium and the right to compensation, considering the related cases, has been protracted and equitable considerations applicable to periods of limitations have come into play. *See deHaas v. Empire Petroleum Co.*, 435 F.2d 1223 (10th Cir.). We must conclude that this action has not been barred. *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713.

■ The trial court acted within its discretion under federal law in the allowance of prejudgment interest. *Royal Indemnity Co. v. United States*, 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361; *St. Paul Mercury Indemnity Co. v. United States*, 201 F.2d 57 (10th Cir.).

■ As to attorney fees awarded by the trial court, we are unable to find any statutory provision for them or any rule of practice which would authorize such fees. The Supreme Court has, since the trial court's decision, decided *F. D. Rich Co. v. Industrial Lumber Co.*, 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703, a Miller Act case. The opinion includes a direct and intensive consideration of attorney fees. The Court there defines the basic rule:

"The so-called 'American Rule' governing the award of attorneys' fees in litigation in the federal courts is that attorneys' fees 'are not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor.'"

The Court concluded that Miller Act suits are "plain and simple commercial litigation," and the Court would not change the American Rule "in the context of everyday commercial litigation." We must hold that this litigation is not so dissimilar to Miller Act suits as to bring about a different result as to attorney fees than expressed in *F. D. Rich Co. See also Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141.

The judgment of the trial court is thus REVERSED as to the award of attorney fees, and as to the equal division between lessor and lessee of the proceeds attributed to the value of the helium, as above indicated. The judgment is also set aside as to the valuation determination with direction to hear further the matters or elements of the work-back method, referred to above, wherein there was insufficient evidence in the record.

Thus some elements have been considered in this opinion and ruled on.

On remand the trial court shall also consider whatever other elements that may be developed at further hearing, in making the value less expense or work-back determination.

Thus, we affirm the use of the work-back method of determining value and the use therein of the $2.00 figure for treatment of crude helium. We set aside the values which the trial court determined by the use of the work-back method. On remand the trial court shall give further consideration to, and receive such evidence as may be admissible bearing on, (1) the proper starting value, (2) the amount chargeable to return on investment, (3) the expense properly allocable to production of hydrocarbons, and (4) such other matters, as are pertinent and not foreclosed herein, that bear on the determination of value by the work-back method.

We affirm the decision of the trial court that the action is not barred by any statute

of limitation and that prejudgment interest may be allowed. We reversed those portions of the judgment that (1) allow attorneys' fees and (2) divide the recovery equally between the lessors and the lessees. The lessors may recover only the amounts determined by the royalty provisions of their leases.

AFFIRMED IN PART, REVERSED IN PART, and remanded for further proceedings in the light of this opinion. Each party shall bear its own costs.

DOYLE, Circuit Judge, dissenting.

I respectfully disagree with the result of the majority opinion and, particularly, that part of it which affirms the trial court's use of the work-back theory or approach in determining a reasonable value for the commingled helium at the wellhead. My disagreement stems from the following: the work-back approach is not the preferred way to determine market value of a commodity; the starting point for determining value is wrong; and the result of its application here is an excessively high price to the government.

Both the government and Phillips Petroleum favor the comparable sales plus expert testimony method; this is the view that I prefer.

I.

WHETHER THE UNITED STATES CONTEMPLATED, AS THE MAJORITY MAINTAINS, THE PAYING OF A SUBSTANTIAL AMOUNT AT A SUBSEQUENT TIME TO LESSEE–PRODUCERS AND LANDOWNERS

I must disagree with the conclusion in the majority opinion that it was within the contemplation of the contracting parties that there would be a large amount paid to interest owners of the commingled helium at some future time. My reasons are as follows:

The Bureau of Mines had entered into contracts for the purchase of extracted helium with four companies, including Phillips, who had possession of the natural gas stream. By so doing the government avoided the necessity for identifying and dealing with all possible interest owners of the helium.

It is true that paragraph 7.4 of the contract with Phillips provided for the partial indemnification of Phillips by the United States for amounts Phillips paid subsequent to the date of the contract for the acquisition of helium in the natural gas or for any interest therein. But to raise the obligation of indemnification, the United States had to consent to the payments or the payments must have been judicially determined or they must have been made in accordance with guidelines established in judicial proceedings. In the Phillips contract indemnification came into being only after Phillips paid in excess of about $3.00 per mcf to third parties for interests in the helium.

The point that is here made is that although the government might have been aware of some indemnification possibility, it did not contemplate the kind of payments that would be necessary if the work-back method were to be followed in both the *Ashland* and the *Helex* cases.

The findings of the trial court do not support the statement in the majority opinion that it was contemplated by Phillips and the United States that there would ultimately be substantial compensation paid to the interest owners. Memoranda written by the Associate Solicitor of the Division of Mineral Resources, Department of the Interior, and by the chief helium contract negotiator for the Bureau of Mines mentioned the possibility of increased contract prices if the government required the extraction companies to give a warranty of title without some government indemnification for helium payments. But there is no evidence that the original amounts to be paid were simply a down payment. There was no prior experience of paying large sums of money for this helium. Mr. Wheeler of the Bureau of Mines testified that in building the cost model to arrive at a government negotiation position, a $2.00 per mcf amount for the commingled helium had been used because that amount reflected

the government's experience in obtaining a supply of helium-bearing gas. It had never paid more than $3.00 per mcf.

The $3.00 per mcf indemnification level was not an arbitrary figure. It represented a ceiling above actual payments on previous occasions. It was an estimation of the probable maximum price that might be paid. Therefore, it is not an established fact that there would be payments in excess of $3.00 per mcf as the majority assumes. Even if some excess above $3.00 per mcf was in the minds of the negotiators of the contracts, it was not any great amount. For example, there is no evidence that it was contemplated that the price would go to $10.30. There was no evidence of a belief that it would exceed $2.00 to $3.00. If it was thought that the $2.00 to $3.00 was just the beginning, it seems likely that the extraction companies would have not left the remaining amounts up to $10.00 to $14.00 to chance. Their contemplation would in some way have been expressed.

## II.

### WHETHER THE EVIDENCE OF COMPARABLE SALES WAS, AS THE MAJORITY MAINTAINS, SO LACKING IN PROBATIVE VALUE AS TO REQUIRE THAT IT BE DISREGARDED

The reasons which the majority opinion gives for rejecting evidence of comparable sales for the purpose of establishing reasonable value include, first, that the transactions described by the witnesses which showed comparable transactions or sales were said to be too remote in time or place. The opinion goes on to say that the testimony did not show a free market condition capable of establishing a usable price.

Secondly, it is said that the helium was part of the gas stream and that this was subject to regulation by the FPC and that this also restricted the opportunities for renegotiation of sales or the negotiation "with new purchases."

The fact that the government was the dominant factor in the market should not, we submit, produce a higher price, for it only tends to show that there was no market for the conservation program gas. Stated differently, there was no demand for it. Where that is the situation, it usually means that it is not worth much. The only reason that it was worth something to the government was because the government had some interest in conserving it. It had some defense projects and space projects in which it might be used and also there is belief by some that in the future it might be of some value in creating an atmosphere for the performance of special tasks. If, as the opinion states, there is neither demand nor market for this, it would seem reasonable to adopt a pricing policy which gives to the lessee-producers such as Ashland actual cost plus a reasonable profit.

My objection to the work-back method is in its artificiality. Interestingly, it fails to start with real cost figures—its beginning is with opinion evidence given by Mr. Garwin, who was employed as manager of the Kerr-McGee plant. He testified on behalf of Ashland. His opinions were based on the price of *pure* helium sold by the government and private companies. He referred to present sales of pure helium on the private market as being $20.00. The government had charged $35.00 not because this represented a fair price. Rather, the government had no choice since it was required by law to charge that amount. The majority apparently has questions about the validity of the $20.00 starting point. It does not give a reason for its dissatisfaction. My objection is its gross excessiveness and its lack of reality.

Moving backward from a $20.00 price for pure helium to the cost of the gas purchased by the government, which was not pure helium but was composed of about 50 percent helium and 50 percent nitrogen, deductions for the cost of extracting helium were made. The end result is prices ranging from $11.76 to $16.98 per mcf for the years 1963–71. The government has already paid to Phillips $10.30 per mcf which includes the cost to Phillips of building an extraction plant. Inasmuch as the govern-

ment is obligated to indemnify Phillips for all sums exceeding $3.00, this means that the difference between the $11.76 to $16.98 figures and the $3.00 indemnification threshold will in all probability be paid in addition by the government.

The trial court and the majority opinion here made no effort to isolate a rule or procedure to ascertain actual market value either from the standpoint of comparable sales or original cost or reproduction cost. It gave its full and exclusive blessing to the work-back theory. The legal objection to this is its secondary evidentiary character. It is secondary because it is called into use only if it is impossible to ascertain actual market value, from comparable sales, for example. It would have been valid to have used it for comparison purposes, that is to test and to compare the validity of the price arrived at by some other more accepted method, but this has not been done. We find them embracing it wholly and completely. This was not justifiable since there was evidence of comparable sales either at the wellhead or at the inlet of the plant.

It is more specifically objectionable because of the $20.00 starting point. If they were going to select a stage in the process and deduct costs in order to arrive at the selling price at the wellhead or at the plant inlet, they should not have started with a product which has nothing whatever to do with this case, that is they should not have attempted to discover a price for pure helium. Instead they should have looked to prices of conservation helium gas with 50 percent helium content and the remainder nitrogen, for this is the product that is sold to the government. The beauty of starting with crude conservation helium is that they had a demonstrable sale in front of them and that is the sale from Phillips to the government for the sum of $10.30 for conservation helium. From this point it would only have been necessary to deduct the costs of extraction and of transportation from the wellhead to the extraction plant. Had they done this they would have come up with a price close to $3.00. It could be more or less. For comparison purposes they could look at the actual sales at the wellhead or at the plant inlet and this would have given them a true picture. It is worthy of note that this is exactly what Judge Brown did in the *Helex* cases, and his result is realistic and reliable. Judge Brown, needless to say, did not accept the work-back theory as an exclusive formula.

In the cases which have used the work-back method, I find that in each instance the court started out with a clearly supported market price and not a contrived one—a price well established in a *real* market for the specific commodity to be valued—*or* with proceeds from the actual sale of the commodity at some later point in its processing. *See Freeland v. Sun Oil Company*, 277 F.2d 154 (5th Cir. 1960); *Black Crystal Coal Co. v. Garland Coal and Mining Co.*, 267 F.2d 569 (10th Cir. 1959); *Greer v. Stanolind Oil and Gas Co.*, 200 F.2d 920 (10th Cir. 1952). *See also Stafos v. Missouri Pacific Railroad Co.*, 367 F.2d 314 (10th Cir. 1966).

This court in *United States v. Sowards*, 370 F.2d 87, 91 (10th Cir. 1966), showed that no one method need be exclusive unless it clearly establishes the price. It pointed out that the federal concept of market value is closely related to selling price on the market and that the best evidence is comparable sales even though the determination is not limited to that method. It approved the use of other data where there are no comparable sales and noted that in condemnation cases market value may also be based upon reproduction costs or capitalization of net income or an interaction of these methods together with comparable sales. It said that all of this must look to what a willing seller would sell for and a willing buyer would pay. The *Sowards* decision nevertheless showed a preference for comparable sales. On the other hand, the work-back method is to be resorted to only where everything else fails.

In summary, then, it was wrong to adopt the work-back method as an exclusive one. It was wrong to start at the point where the trial court started and, of course, the

result is an untenable one because it unnecessarily produces an excessive price.

What about the comparable sales which the majority opinion condemns?

We must bear in mind that the contracts entered into by the government looked to prices in 1961. The Keyes plant was cited for example and this involved purchases of gas by the government in 1958 at prices approximating $2.00 per mcf at the extraction plant inlet. The production costs were about $15.50 per mcf, but the basic interest of the seller was to make residue gas marketable by raising the BTU content. This was the approach that was used in the Otis plant also. It was seeking to upgrade gas for fuel purposes.

I would submit that the fact that there was this kind of motivation does not outlaw the comparable sales evidence. Removal of helium as an aid to the heating quality of the gas ought not to render the evidence of the sale noncogent.

The purchases of the government plants at Navajo, Exell, Otis and Cunningham are said to be out of time because they occurred in 1945 during the War. They are hardly more remote from 1961 than are the sales cited by Mr. Garwin, that is the $20.00 sales which occurred in relatively recent times. There were also purchases of helium-bearing gas for the Navajo plant in 1955, 1959, and 1962; all at about $2.00 per mcf for helium content at the plant inlet.

The gas sales agreement between Colorado Interstate and Alamo Chemical Company, a Phillips affiliate, which were at $2.00 per mcf, does not appear to be out of line. The 1945 Navajo sales just referred to were determined by the Court of Claims to have a value of $2.99 per mcf. The fact that they occurred in 1945 could be taken into account, but this is a two-edged sword because there was some actual demand for this gas during the World War II period.

I am not saying that the comparable sales should be accepted as gospel. This does not mean, however, that we should bury our heads in the sand to them. We can at least view them without fear of being contaminated. The probative value of actual sales is that they provide a more rational and realistic view of value than does some theoretical approach such as the work-back approach because these are actual demonstrations. The majority opinion does not tell us where the social or other value is in the work-back theory. As suggested before, it might be palatable if actual cost figures were used in arriving at a starting point. It is, however, lacking in palatability when the opinion of the chief witness for Ashland that $20.00 is a fair price for pure helium is accepted completely as the starting point for a work-back process.

The foregoing is important because we are dealing not with $100,000 or even a few million. Ultimately if the work-back formula is used this could mean—and we consider not only this case but its companion, the *Helex II* cases which have yet to be handed down but which are likely to follow this same formula—hundreds of millions of additional dollars to be paid by the government for a commodity which at best has an uncertain value now and which does not promise to have any added value in the future.

III.

WHETHER TODAY'S DECISION WILL RESULT IN THE GOVERNMENT'S BEING COMPELLED TO PAY AN UNREASONABLY HIGH PRICE, AN AMOUNT WHICH IS BEYOND THE MARKET VALUE OF THE HELIUM GAS

What would be the effect if the work-back method were applied to the *Helex II* cases?

Most of the helium in the United States occurs in Kansas, Oklahoma and Texas. It is not surprising, therefore, that the companion case to this present one, the so-called *Helex II* cases, arose in Kansas. The enormity of the occurrence was probably responsible for the helium conservation program in the beginning. These Kansas cases have been before this court previously. They were filed in 1964. The first one was

decided at trial in 1968. It is reported at 292 F.Supp. 619. That decision was reviewed by this court in 1971. *Northern Natural Gas Co. v. Grounds*, 441 F.2d 704. This initial case was primarily concerned with title to the helium. Following remand, trial was had in order to determine value. As in the instant case, the government had already paid a substantial amount, about $12.00 per mcf, which purported to represent the cost of the extraction plants as well as the cost of the helium. The action was in interpleader. Its purpose was to determine the value of the helium and hence the obligation, if any, of the government or a party to pay additional amounts. At the trial evidence of comparable sales was not dissimilar to the evidence offered at the *Ashland* case. There was a difference. A good deal of opinion and interpretative evidence was offered on behalf of the government. In sum, the government presented a real case in this instance—a much stronger case than was brought forth in *Ashland*.

The trial court's findings were much different. Utilizing the comparable sales, and the opinion evidence, the trial court found that the value of helium at the wellhead was $.60 to $.70 per mcf. As a result, the government was not required to pay any more than the $12.00 which it had paid for the gas at the well plus extraction expense including building a plant. This was because the value found was less than the $3.00 amount beyond which the government was required to indemnify. The additional amount, $.60 to $.70, had to be paid by the Helex companies to the lessee-producers.

If the formula approved in the present case were to be applied to the *Helex* cases there may be a far different result. I am not saying that it will. I do not know. The trial record is superior in the *Helex* cases and this could change it. On the other hand, the work-back doctrine is firmly adopted. If this present *Ashland* ruling becomes a precedent for the upcoming *Helex II* cases, the result could be a disaster to the government in that it could virtually double its cost. The price could go from $12.00 (the amount already paid and which under the *Helex* trial court's decision is the entire sum), to as high as $26.00.

The *Ashland* case is in sharp contrast. The trial court, as we already know, employed the work-back method in arriving at values of commingled helium. The prices which it adopted were $11.76 to $16.98 per mcf for the years 1963–72. This was in addition to the $10.30 already paid by the government to Phillips to cover the total cost of extraction plus cost of gas at the well. The majority opinion in this case gives restricted approval to the work-back method. It remands for additional proceedings to reconsider three factors used. In remanding the case the majority opinion has not, as we have also noted, given the trial court any guidance as to what is sought and as to how these factors are to be determined. Therefore, the outcome of the remand as it effects the values in the *Ashland* case cannot be anticipated. These values may be lower or they could just as easily be higher. Thus, both the viewpoint and the result in *Ashland* are entirely different from the approach and result in the *Helex II* cases. That is why I am apprehensive as to possible results in the *Helex* cases when the court gets around to applying the work-back theory as now enunciated.

We are mindful that the government has already paid the extraction companies a total of about $12.00 per mcf for the 36,500,000 mcf's of crude helium in *Helex*. This is a sum of about $438 million for helium which has been purchased and which has been stored under the conservation program. We cite it to show the magnitude of this purchase and the extent to which the government would be called upon to indemnify if the work-back method were to be applied in the *Helex II* cases. If the pattern of the present case continues, there could be additional payment of from $9.00

to $12.00 per mcf. It remains to multiply 36,500,000 mcf by the $9.00 or $12.00 addition in order to view the dismal news.

I submit that the *Helex II* cases ought to have been the precedent and the model rather than the *Ashland* case.

\* \* \*

Finally, this entire helium conservation program is affected with a public interest. As the majority notes, there is no competition to provide low prices. It is a monopoly condition and the determination of reasonableness of prices has devolved on the courts. The court should, of course, see to it that the companies involved in the production of the helium receive fair compensation. Fair compensation does not mean that the participants should receive profits of the possible magnitude indicated here.