**ASHLAND OIL, INC., Plaintiff,**

**v.**

**PHILLIPS PETROLEUM COMPANY, Defendant,**

**and**

**United States of America, Intervenor.**

No. 67–C–238.

United States District Court, N. D. Oklahoma.

Dec. 28, 1978.

Gerald Sawatzky of Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., John M. Imel of Martin, Logan, Moyers, Martin & Conway, Tulsa, Okl., and W. O. Strong, III, Ashland Oil, Inc., Houston, Tex., for plaintiff Ashland Oil, Inc.

Don L. Jemison, Phillips Petroleum Co., Bartlesville, Okl., and L. K. Smith of Boone, Ellison & Smith, Tulsa, Okl., for defendant Phillips Petroleum Co.

John E. Lindskold, Dennis A. Dutterer and Andrew F. Walch, Dept. of Justice, Washington, D. C., and Hubert H. Bryant, U. S. Atty., and Hubert A. Marlow, Asst. U. S. Atty., Tulsa, Okl., for intervenor United States.

### MEMORANDUM OPINION

BOHANON, District Judge.

#### Introduction

*(See also Findings Nos. 1–13)*

Plaintiff Ashland seeks compensation for helium contained in the natural gas stream

---

acquired from plaintiff by defendant Phillips, which was subsequently extracted and sold separately to the United States government. Originally tried in 1973, this case was remanded on appeal to retry controlling factual issues. In the first trial plaintiff and defendants' legal theories and approaches were sufficiently divergent to prevent a joining of issues. Consequently, crucial factual considerations were never fully developed evidentially. At retrial the significant factual matters were developed more fully and thoughtfully than before. Thus, the court must be amenable to discarding earlier erroneous conclusions. The interests of justice, aptly perceived by the circuit court opinion in this case, require no less.

In adjudicating this controversy a second time, the court was assisted by the appellate court's enunciation of certain controlling legal principles. The basic legal relationships among the landowners, producers and gas purchasers were established, notably including the lessee-producer's right to the reasonable value of the contained helium. *Northern Natural Gas Company v. Grounds*, 441 F.2d 704 (10th Cir. 1971); *Ashland Oil, Inc. v. Phillips Petroleum Company* (hereafter *Ashland v. Phillips*), 554 F.2d 381 at 384 (10th Cir. 1975).

The prime responsibility of this court is to determine the reasonable value of the helium herein when commingled at the wellhead with other natural gas. *Ashland v. Phillips, supra* at 385–386. Such "value" is basically a factual matter to be ascertained through application of the appropriate legal doctrines. *Ashland v. Phillips, supra* at 385. Optimally, a product's "fair market value" is determinable by examining comparable sales of the same product. *Ashland v. Phillips, supra* at 387. Significantly, some sales of commingled helium offered in evidence here were too remote in time, and otherwise incomparable, to be relied on solely.

## The "Work-Back" Method

The next best approach is the "work-back" or "value less expense" method whereby a raw material's value is extrapolated by using as a starting point an end product of that material whose value is certain. The costs of transforming the raw material from the stage where its value is unknown to that where its value is certain are subtracted from the starting value to reveal the value being sought.

"The work-back valuation is well recognized in the production and early processing of natural gas. . . . There is nothing unusual about the method, it is subject to proof, and can be just as accurate as any other method, but it is more difficult to apply." *Ashland v. Phillips, supra* at 387.

Effective application of this method requires selection of an appropriate starting value in the form of a processing stage whose product possesses a value certain; accurate assessment of the costs accruing between the known stage and the one in question is also essential. In developing a resource from a raw material into a finished product, each production stage will add economic value to what was initially only the value of the raw material. The value added at each stage of production is essentially the cost of resources used in taking the material through that stage of production. The work-back method essentially establishes at each production stage the value of the product at that point. By subtracting out all production costs, the value of the raw material is revealed.[1] Appli-

---

1. "Yes, I am familiar with the workback method of discovering the value of a raw material where there are no comparable sales that can be used to attribute value to it. Essentially, as I understand it, if a raw material is scarce enough to command a price or to have an economic value, then, this raw material may go through several stages of production and production process to turn it into an end product. At each of the production stages, there will be value added to what was originally a value of the raw material. The value added at each stage of production is essentially the cost of resources used in taking the material through that stage of production.

Now, then, a workback amounts to determining at some stage, at some market, at one of the stages of production, what the value of the product up to that point really is. Then, we subtract out the costs and that should leave us

cation of this approach, however, can be difficult. Market structures vary at different production stages and correlating figures from one stage to the next can require abstruse analytical calculations, easily resulting in error. The selected starting point should be as close as possible to the production stage in question.[2]

With these theoretical considerations in mind, two potentially viable starting points emerge. One is helium in its crude form; the other is helium in its pure Grade A refined form, the starting point initially adopted by this court.

### Refined Helium Market

#### (See also Findings Nos. 14–18)

If one fact has clearly emerged at retrial, it is the inappropriateness of using refined helium prices as a starting value in extrapolating commingled helium's value at the wellhead.

Possession of a production phase where the raw material has been processed to a point of possessing a value certain is crucial

to the work-back method, whose efficacy is based on employing known data to extrapolate the unknown. Refined helium prices for the time period relevant to this case were not only distorted by monopolistic market conditions which prevented pure helium's prices from reflecting the product's "fair market value," but even more significantly there was never any relationship whatsoever established between the commingled helium in this case and any refined helium market.

All of the commingled helium in this case was processed into crude helium and placed in underground storage by the government, where it remains today. None has been refined into Grade A helium.[3] It was acquired with conservational intent and for consumption at some undetermined future time. Any suggestion that the helium in this case could have been refined and subsequently sold at then prevailing market prices of $20 to $35 per Mcf is at variance with what the most persuasive evidence before this court demonstrates to be the truth.[4]

---

with the economic value of the raw material, if the starting point is correct, if the workback is correctly done." (Tr. 368–369, Dr. Richard H. Leftwich, Regents Professor of Economics and former head of the Department of Economics at Oklahoma State University.)

2. ". . . [I]f you work back through several successive stages in going from one stage of the production process to another, there are likely to be errors involved, errors involved in computations. There will be errors involved because market structures differ at differing stages of production, and the more stages of production that you work back through, the more likely we are to compound these errors and to wind up with an erroneous computation, an erroneous value for the raw material. . . [I]t seems to me that the appropriate starting point is the closest identifiable market to the raw material." (Tr. 369–370, Dr. Leftwich, supra)

See also the testimony of Dr. Ezra Solomon, Dean Witter Professor of Finance at Stanford University, at Tr. 418.

3. ". . . [T]he crude helium that has been put into the government's Cliffside field . . was never produced to supply current demands. . . . We don't know when it's going to be used. We don't know what purpose it's going to be used for, and we don't know what price it's going to be sold for some-

time in the future, when and if it's ever used. . . .

So, it's setting there, and it's in the Cliffside field, and there is 36 billion cubic feet of it. Now, 2 billion cubic feet of that was put in there by the Bureau of Mines, so only 34 billion cubic feet represents helium that was obtained from the conservation companies . . . ." (Tr. 321–322, Henry P. Wheeler, Jr., former Assistant Director to the Bureau of Mines responsible for the government's helium conservation program)

"Q Of all of the helium acquired under the conservation program is all of it in storage at Cliffside?

A Yes, it is." (Tr. 283, 284, Ray D. Munnerlyn, Chief of the Helium Division of the Bureau of Mines)

4. ". . . Ashland's calculations assume that if more crude had been refined, that the price would not have changed. Basic economic principle called the law of demand tells us that this is false, and the numerical analyses that I have just gone through show just how false this kind of an assumption, an underlying assumption can be. Because only a very small increase in the quantity of crude refined would lead to a relatively large decrease in the price of the Grade A helium." (Tr. 794, Dr. Ronald Braeutigam, Professor of Economics at Northwestern University)

Refined helium prices during the period in question consistently were distorted by effects of a monopolistic seller's market and never were determined by free and open competition. Government prices based on long-term policy considerations completely dominated the market in the initial years significant to this case, and were influential throughout the entire course of the pertinent time period. Introduction into the refined helium market of even a small percentage of the large helium quantities at issue here would have plummeted prices industry-wide, not only because any reasonable competition would have constituted an effective assault on the then prevailing artificially high price structure, but also due to the relatively inelastic helium demand at the time. Only a small number of end uses for refined helium exist, and those end uses can absorb only limited quantities of refined helium.[5] When a product is available in quantities greatly exceeding anything the market requires or can absorb, the excess amount is worth very little and will tend to severely depress prices, as competition forces sellers to unload their product for virtually anything they can get.[6]

Large quantities of crude helium were produced and sold in the United States during the years in question. In comparison, very small quantities of refined helium were bought and sold. In light of the inelasticity of demand for refined helium, and the marked disparity volume-wise between crude and refined helium, the best evidence indicates that a 1 percent increase in the refinement of available crude helium would have led to a drop in refined helium prices of at least 5 percent, and possibly in excess of 9 percent, depending on the year chosen.[7] Introduction of a large quantity of such helium into the market would have driven the price down to near zero.[8]

The salient fact questions herein can in no manner be resolved by reference to the refined helium market. The helium here was never refined, and it never influenced or was affected by any refined market. Simply stated, in this case refined helium prices represent an inappropriate and unsatisfactory starting point for application of the work-back method. The best evidence repeatedly emphasizes the ineffectiveness of attempting to infer the value of large quantities of crude or commingled helium, based upon the relatively small number of refined helium market transactions.[9]

5. "There are a small number of end uses of refined helium and each of these end uses can absorb only limited quantities of refined helium." (Tr. 386, Dr. Leftwich, supra)

6. "We could have gone out and been very hard bargainers, playing one of these companies against the other, because obviously some of them are going to get something for their helium and some of them were not . . . ." (Tr. 324, Wheeler, supra)

7. ". . . [T]he volume of the crude helium was something like five to nine times the volume of the helium in the Grade A market, depending on which year you pick. So, for example, if we were to take one percent of the crude in any given year that had been produced and convert that to Grade A, then, you would get from five to nine percent change in the quantity of Grade A helium. And using this information on elasticity of demand, we conclude that the one percent increase in the quantity of crude which is refined would lead to a drop in price in the Grade A market, at least five percent, and maybe even more than nine percent, depending on the year we pick." (Tr. 793, Dr. Braeutigam, supra)

8. "If a very large quantity of Grade A helium or refined helium were thrown on the market, this would drive the price down to near zero." (Tr. 387, Dr. Leftwich, supra)

9. "It is simply not proper to infer the value of a large amount of crude helium, based upon the small amount of helium in the Grade A market. And to illustrate this. Suppose we did start with that $20 price of Grade A helium and suppose following the workback method we subtracted off the cost of converting crude helium to Grade A helium to arrive at some kind of net price for crude helium. The next step in the workback method then would be to try to compute a value for all of that crude helium, and this would be done by taking the net price that we calculated and multiplying it by the quantity of crude. The problem which arises is simply this. It imputes a value to all of the crude helium, based upon the $20 attached to only a very small volume in the Grade A market. In other words, the method that was proposed by Ashland assumes, in principle, if not in fact, that we could have refined all of that crude helium and sold it in the Grade A markets and that the price would not change from $20. This violates the fundamental law which

## Crude Helium Market

### (See also Finding No. 19)

The other potential starting point for application of the work-back method is the crude helium market. It represents the first processing stage at which helium *per se* is freely marketed and the first form into which commingled helium is separated. The close proximity of the two stages makes work-back calculations easier and more reliable. During the relevant years, crude helium production was much more comparable in quantity to commingled helium production than was refined helium production, and all the helium at issue was sold and maintained in crude helium form. The crude helium market was by far the largest helium market existent during the pertinent ten year period. Beginning the work-back method here would allow us to make computations on the basis of events and transactions which actually occurred, and would minimize the need for speculation of the type refined helium figures require.

Supply and demand characteristics of the crude helium market were similar in size and structure to those which would have attended a commingled helium market if one had been independently identifiable, and the comparability of these economic factors makes comparisons between the commingled and crude stages much more realistic than comparisons with the refined stage.

Several factors made crude helium prices more representative of helium's fair market value at that level than pure helium prices were at the refined level. When the conservation program was initiated, a great many potential sellers received notice from the government of its intention to buy crude helium, and some 13 or 14 companies expressed interest in contracting as crude helium suppliers. The contracts which finally emerged, including Phillips' contract, followed extensive "good faith" and "arm's length" negotiations. The price paid for crude helium to the "Helex" companies, including Phillips, averaged about $12 per Mcf. While the evidence reveals that the crude helium market was not a perfectly competitive market in the classical economic sense, throughout most of the relevant period there were at least four sellers in the market, dealing at prices freely negotiated, and substantial amounts of crude helium were exchanged within a fairly narrow range of prices.[10] This market was at least imperfectly competitive and significantly more competitive than the refined market. A rather well developed crude helium market existed, then, during the time period relevant here, generally operating within a price range of $11.00 to $14.00.

### Phillips Contract Price

Since the evidence of both Ashland and defendant Phillips offers work-back calculations based on Phillips' actual extraction costs, employing Phillips' actual contract price as a starting value would be ideal if shown to represent a fair and reasonable price for crude helium.[11] The Phillips con-

economists call the law of demand, namely, we know that if the quantity of Grade A helium had been larger, that the price would have dropped. And this is exactly the point that Ashland has ignored in coming up with this workback method and applying the $20 figure as though we can impute a value to all of that crude helium based on that quantity, which is very small in the Grade A market." (Tr. 789–790, Dr. Braeutigam, supra)

10. "I think that to start with we have a market which I would not characterize at the crude level as being a perfectly competitive market, certainly, in the classical economic sense. However, we do have throughout most of the time period I'm talking about evidence that we had at least four sellers in that market, and

they were entering into contracts at prices which were not dictated, either by the government or by anyone else. They were freely negotiated prices. I would characterize the market as perhaps imperfectly competitive . . . .." (Tr. 801, Dr. Braeutigam, supra)

"So with these exchanges and very very substantial amounts of crude helium being exchanged, within a fairly narrow range of prices, I think there is no question but what we had a very good market for crude helium existing." (Tr. 375–376, Dr. Leftwich, supra)

11. ". . . [S]ince the workback cost figures that are being used in this case are Phillips' cost figures, Phillips' workback cost figures, then it appears to me that they ought to be applied to a Phillips' price, rather than taking

tract was one of four negotiated with the four "Helex" companies and, like the others, resulted from extensive "arms length" negotiations. The court is now persuaded that Phillips' contract price of approximately $10.30 per Mcf represented a fundamentally fair and reasonable price for crude helium. This contrasts with the first trial, wherein the evidence demonstrated no relationship between the negotiated contract price and the fair market value of the helium. *See Ashland v. Phillips, supra* at 384.

Ashland's argument that the contract figure did not represent the full and complete helium "price," due to the contract's indemnity clause, is persuasive on its face but was shown at retrial to be factually unsound. At issue is contractual provision 7.4 of the Phillips contract, wherein the government agreed to indemnify Phillips for amounts in excess of $3.00 paid to third parties for their helium ownership rights. Such provision implies that the complete crude helium price was contemplated to be the base figure of approximately $10.30 plus additional payments required by third party ownership interests. The evidence now establishes that the base figure was considered by the parties to be the full and complete price for the crude helium and that it, in fact, constituted a fair and reasonable price. Phillips' negotiators had been advised by legal counsel that Phillips possessed sole and complete title to all of the contracted helium. Phillips was willing to so warrant its title and was intent on negotiating a contract price reflecting the full and complete value of the crude helium. Approximately half of the helium Phillips contracted to sell was produced from its own gas wells and indisputably belonged to Phillips, and the base contract figure unquestionably

represented full payment as to this one-half.[12] Significantly, the indemnification clause was never requested by Phillips, and was never a focal point of negotiations, but was merely inserted at the government's behest to provide continuity with previously negotiated contracts containing the same clause.

Ashland's contentions that the negotiated contract price was depressed by the potential threat of government condemnation of the helium is not supported by the record. The negotiated price essentially represented that dollar figure necessary to induce Phillips to bring forth the amount of crude helium the government wanted to purchase from Phillips.[13] Any evidence indicating a variance between the contract price and the helium's worth would seem to indicate that perhaps the price was slightly too high, since Phillips' bid was accepted for reasons influenced by conversation considerations even though slightly higher than one of its competitors.

*Processing Costs*

*(See also Findings Nos. 25–31)*

In computing a cost figure to be applied in the work-back method, this court was directed on remand to receive further evidence on, *inter alia,* the appropriate amount chargeable to costs as a return on investment and the amount of helium plant expense properly allocable to production of hydrocarbons and thus not properly chargeable to costs. Having determined that a 15 percent rate of return on investment is appropriate for reasons detailed in the court's attendant findings of fact, and having adjusted the cost figures to allow for hydrocarbon expenses, the court has exam-

---

Phillips' cost figures and applying it to some nebulous overall price. If we are going to use Phillips' costs, let's use Phillips' price to do our workback." (Tr. 391, Dr. Leftwich, supra)

12. ". . . [I]n the case of Phillips, one-half of its total crude sales to the government consisted of commingled gas that was not subject to the indemnity provision. And the price they sold that half at was no different than the price they sold the other half at, which did have something to do with the indemnity provision,

which would suggest to me that they could not have given a great deal of weight to that provision in determining the negotiated price they settled on." (Tr. 423, Dr. Solomon, supra)

13. "[The Phillips contract price] was a price that was necessary to induce Phillips to bring forth the amount of crude helium that the government wanted to purchase from Phillips." (Tr. 391, Dr. Leftwich, supra)

ined computations based on crude helium values, including Phillips' contract price, in comparison with Phillips' actual costs. The court believes that the fair market value of Ashland's helium at the crude helium stage was in the vicinity of $10.50 to $12.00 per Mcf. Phillips' actual extraction costs during this period averaged out between $6.50 and $7.00 per Mcf. at Sherman, and slightly in excess of $10.00 per Mcf. at Dumas. Selecting a range of costs between $6.50 and $8.00 per Mcf as being fair, the work-back method reveals that Ashland's recovery should be between $2.50 and $5.50 per Mcf.

### Exact Computations

No automatic and exact solution to the problem of valuing commingled helium simplistically emerges from application of the work-back method to the relevant data. A rigid statistical approach preoccupied with mathematical precision would generate rather widely differing values for different "shipments" of commingled helium, depending upon the year of production and the processing plant utilized.[14] Even then such precision could be attained only by delineating an artificially exact crude helium value as a starting point.

The exact contract price between Phillips and the government varied from year to year and plant to plant. The $10.30 price referred to earlier is less expressive of a precise crude helium value than it is of a figure located within a reasonable range of crude helium values. The work-back method reveals only that the commingled helium in this case should be valued somewhere between $2.50 and $5.50 per Mcf, depending upon the comparative weight assigned to the various relevant statistics.

### Quantum Meruit

Recovery in this case rests upon the doctrine of "quantum meruit," wherein the law implies an agreement and allows recovery of "what is reasonable" and what one "rea-

sonably deserves" for benefits conferred in the absence of an express contract. *Brown v. Wrightsman,* 175 Okl. 189, 51 P.2d 761, 763 (1935) "Quantum meruit" applies where actual contractual intent and mutual assent by the parties is lacking; compensation is afforded based upon reason and justice. *Hillyer v. Pan American Petroleum Corporation,* 225 F.Supp. 425 (N.D.Okla.1963). This rule of law stresses the inequity of a party refusing to pay for benefits received knowingly and with consent, from someone lawfully authorized to expect remuneration therefor. *Kramer v. Wilson,* 226 S.W.2d 675 (Tex.Civ.App.1950); *Parks v. Kelley,* 147 S.W.2d 821 (Tex.Civ.App.1941).

### Fair Market Value

#### (See also Findings Nos. 32–35)

The economic value of commingled helium is not as high as evidence at the first trial led the court to believe. It is not, on the other hand, inconsequential. The circuit court of appeals has correctly emphasized that helium has value by reason of its nature and usefulness, and that the government's conservation program may have preserved such value and made it available, but it did not create such. *Ashland v. Phillips, supra* at 389.

Significantly, however, the evidence at retrial established that helium's uses are limited and its demand is relatively small. This helium demand consistently has been dwarfed by the size of potential supplies. During the period of the helium conservation program and in the years immediately thereafter (1963–1977) only about 40 percent of the helium produced in helium-rich natural gas was recovered. Since the conservation program was completed, approximately 80 to 90 percent of the helium produced from the major helium-rich gas fields has been discarded at the wellhead and allowed to escape to the atmosphere due to the absence of a viable market.

---

**14.** Strict application of the work-back method would indicate that helium processed through the Sherman plant was worth $2.22 more at the wellhead than helium processed through the Dumas plant. (See Tr. 930. John C. Dunn, Economic and Financial Consultant)

Even in 1968, during the peak of the helium conservation program, 8.36 billion cubic feet of helium was produced in natural gas, but only 4.59 billion cubic feet was recovered. 3.77 billion cubic feet was vented into the air.

Over 188 billion cubic feet of commingled helium in proved probable reserves of helium-rich gas (containing 0.3 percent helium or more) had been identified as of 1977. An additional 171 billion cubic feet of helium commingled in reserves of less-rich natural gas (containing less than 0.3 percent helium) has been identified. This reserve total of 359 billion cubic feet of commingled helium compares with helium consumption in 1977 totalling 0.9 billion cubic feet.[15]

The helium owners in this case were fortunate that their helium was selected to be conserved. Most of the nation's helium owners possessed no opportunity to sell at any price and received no compensation whatsoever for their helium. While plaintiffs are entitled to "reasonable compensation," this amount must fairly equate with the helium's "fair market value."

A market exists wherever two or more parties contact one another to engage an exchange, and where the parties agree on the terms thereof. The "fair market value" of an item is reflected in the price at which both buyers and sellers are willing to engage an exchange, and the price at which neither shortages nor surpluses will occur.

It is the price at which sellers are induced to bring to market those quantities that buyers are willing to buy at that price. Normally, for a "market" and a "fair market value" to exist, the market price must be sufficient to cover costs of production and a normal profit to the sellers.[16]

Henry P. Wheeler, Jr., former Bureau of Mines employee in charge of the helium conservation program, and the government negotiator with the Helex companies, testified that the government could have purchased all of the commingled helium it desired for $2.00 per Mcf.[17] This analysis is generally supported by the record, including evidence of market conditions existent at the time.

In negotiating with Helex companies, government negotiations employed a "work-up" method to value the commingled helium. Similar in principle to the "work-back" method, this approach added cost increments to a selected wellhead starting value in order to arrive at the crude helium's reasonable value. This "work-up" method, whose results provided the bases for the resulting contracts, was predicated on the use of a $2.00 per Mcf value for helium at the wellhead. (See Phillips' Exhibit 71). Dr. Leo Garwin, plaintiff's own expert witness, recognized commingled helium's value during the years in question as being between $2.00 and $3.00.[18] Also, at

15. United States Exhibit No. 28

16. ". . . [A] market exists wherever two or more parties contact one another to engage an exchange, and where the parties agree on the terms of exchange." (Tr. 370, Dr. Leftwich, supra)

". . . [T]he market value of any item is reflected by the price at which both buyers and sellers are willing to exchange the item and a price at which neither shortages, nor surpluses, will occur.

Now, I would like to observe further here that the market value of an item is a price at which sellers are just induced to bring to market the quantities that buyers are willing to buy at that price. In other words, the value or the market price of an item must be sufficient to cover cost of production and a normal profit to the sellers, to the producers and the sellers.

The contract prices as a group that the conservation companies received from the government I think must be very close to a market value for crude helium. I think they must be very close to what a competitive price would be." (Tr. 376–377, Dr. Leftwich, supra)

17. ". . . I would say that any application of any theory which comes out with an answer which is much different from $2, either plus or minus a little bit, there is something wrong with the method, because it does not adequately reflect the situation that existed at the time.

Q And why do you say that, sir?
A I was there, I knew what it cost to go out to get helium-bearing natural gas, and I know that I could have gotten all we wanted for $2, or less, and that's what it was worth." (Tr. 337–338, Wheeler, supra)

18. Tr. 838–848. Dr. Leo Garwin, Consulting Engineer. See finding of fact No. 35.

least one 1966 sale between private parties utilized a $2.00 per Mcf Price.[19]

Plaintiff's efforts to predict an eventual high economic value for helium possess little dependability or relevance to this case's issues. Estimates of future demand for most commodities, including helium, are less than reliable.[20] In any event, plaintiff's measure of recovery is tied to commingled helium's value as computed at the time of Phillips' sale. Speculation portends that exorbitant prices may eventually attach to such natural resources as land, water, wood and perhaps even clean air, yet their present economic value is governed by present availability rather than potential future scarcity.

A full and careful review of the record in this case reveals a myriad of considerations relevant to an appropriate valuation of Ashland's helium commingled at the wellhead, none of which, however, individually establish an exact dollar figure. The full range of reasonable values disclosed by the proper application of "work-back methodology, the structure and salient economic factors of the various helium markets during the period in question, the expert testimony of record, and the equitable considerations collectively suggest that the reasonable value of the commingled helium in this case is between $2.00 and $3.00 per Mcf regardless of the year of production or the extraction plant utilized.

This determination, and the bases therefor, are hereinafter detailed.

In addition to the findings and conclusions in the preceding text, and by way of elaboration thereon, the court delineates the following:

## FINDINGS OF FACT

### Introduction

1. Helium is an unusual element; it is a gas which is inert and noncombustible and is the second lightest known element. Helium is so inert that it will not chemically react or combine with other elements and thus remains as helium forever. It is tasteless, colorless, odorless and invisible. For a more complete description of helium, its unusual characteristics, its uses, and where found, etc., see *Northern Natural Gas Co. v. Grounds, supra* and in the opinion of U. S. District Judge Wesley E. Brown, 292 F.Supp. 619 (D.C.Kan.1968).

2. In the 1940's, the United States Bureau of Mines was the sole producer of helium in the nation, and it purchased commingled helium in the pipeline at the same price as the natural gas itself, ranging from 5 to 8 cents per Mcf.[21] In the late 1950's the Bureau of Mines purchased helium contained in natural gas in the pipeline for its Keyes plant operation at the price of approximately $2.00 per Mcf contained heli-

19. Q. "Now, did Kansas-Nebraska enter into an agreement with Cities Service . . ?

A. Yes, sir, there is a—there is a provision in the processing agreement for a payment for the right to extract the helium.
Q. All right, sir. Do you recall what that payment—
A. Yes, sir, its $2.00 per mcf.
Q. Of contained helium?
A. Yes, sir.
Q. Is that contained helium extracted?
A. Extracted, yes, sir.
Q. And can you tell the court generally how the $2.00 price was arrived at?
A. My memory is that at the time we were negotiating that arrangement with Cities, we only had one pattern to go by, which was a contract between Colorado Interstate and the government at the Keyes, that's K-e-y-e-s, plant, and that was $2.00. We were willing to accept that and Cities

was willing to pay that, so that's what we arrived at.
Q. All right, sir. And do you recall about what year that would have been in?
A. I think that was probably about 1966, I guess."
(Tr. 14–15. Defendant Phillips' Exhibit No. 39. Deposition of S. D. Ford, Jr., vice president of production and gas supply with Kansas-Nebraska Natural Gas Company)

20. "Estimates of the future demand of any commodity are notoriously unreliable and helium is no exception." (Plaintiff's Exhibit 2–31, p. 16, A Report to the President and the Congress of the United States on the Energy-Related Applications of Helium and Recommendations Concerning the Management of the Federal Helium Programs. See also Tr. 982)

21. One Mcf is one thousand (1,000) cubic feet.

um; the Bureau of Mines was willing to pay a premium price for the gas because of the high helium content (2.0 percent rather than 0.5 percent contained helium) which resulted in savings in production costs.

3. Pursuant to the authority granted by Congress in the Helium Act Amendments of 1960 (50 U.S.C. § 167 et seq.), the United States entered into long-term crude helium purchase contracts with four companies, the "Helex" companies, to construct plants for the extraction of helium from natural gas streams being produced from the Hugoton-Panhandle area. Each of the contracts was executed on a different date, had three different initial unit prices per Mcf during each year of the contract for the life of the contract. The maximum annual obligation for each contract was different under the limitations imposed by Congress, i. e., only the sum of $47.5 million could be expended annually to buy helium under the Government's program to conserve helium. A summary of the contracts is set forth in Table 1 below:

TABLE 1

SUMMARY OF HELIUM CONSERVATION CONTRACTS

| Company | Plant Location and Date of Contract | Initial Unit Price (for 1,000 cubic feet) | Maximum Annual Obligation (million dollars) | Estimated Helium Volume (million cubic feet) | |
|---|---|---|---|---|---|
| | | | | Annual Average | Life of Contract |
| Northern Helex Company | Bushton, Kansas 8–15–61 | $11.24 | $9.5 | 675 | 13,500 |
| Cities Service Helex, Inc. | Ulysses, Kansas 8–22–61 | 11.78 | 9.1 | 610 | 12,200 |
| National Helium Corp. | Liberal, Kansas 10–31–61 | 11.78 | 15.2 | 1,053 | 21,060 |
| Phillips Petroleum Company | Dumas, Texas) and ) 2 plants Sherman Co., ) Texas 11–13–61 | 10.30 | 13.5 | 788 | 15,766 |
| Weighted average—$11.29 | | | | | |
| TOTAL | | | $47.5 | 3,126 | 62,526 |

4. In addition to Phillips Petroleum Company, the last of the Helex companies to enter into a conservation contract with the United States, agreements for the purchase of crude helium were reached with National Helium Corp., Cities Service Helex, Inc., and the Helex Company (later Northern Helex Company).

5. The crude helium conservation system consists of 5 privately owned crude helium production plants, a main pipeline running from Bushtown Plant in Kansas to the storage site at the Cliffside field in Texas and lateral pipelines running from the main pipeline to certain Grade A helium production plants. Three of the conservation plants are located in Kansas: the Bushtown Plant of Northern Helex, the Jay Hawk Plant of City Service Helex and the Liberal Plants of National Helium. The plants at Sherman and Dumas, Texas, belong to Phillips Petroleum.

ESSENTIAL LINK in the nation's helium conservation program is a 353-mile pipeline constructed by the federal government in 1962 and connecting five privately owned and four government-operated extraction plants to an underground storage area in the Cliffside field near Amarillo, Tex.

6. Under the terms of its contract of November 13, 1961, Phillips agreed to sell the United States a helium gas mixture from two plants it proposed to build at Sherman and Dumas, Texas. The plants were constructed to extract for delivery and sale to the government, per the contractual terms, a helium gas mixture (crude helium) of at least 50 percent helium, with the remainder being essentially nitrogen. The nominal capacity for production of crude helium for the Sherman and Dumas plants was 360,000 Mcf per year and 428,000 Mcf per year, respectively. Production began at the Sherman plant in December, 1962, and at the Dumas plant in April, 1963.

7. Three private plants which in 1978 were producing Grade A helium from crude helium, are connected to the helium conservation system by way of private pipelines.

These are the plants of Kansas Refined Helium Company, City Service Cryogenics and the Alamo Chemical and Gardener Cryogenics plants, all in Kansas. Of the three Bureau of Mines plants in the conservation system, only the Keyes plant in Oklahoma is still producing Grade A helium from a crude helium stock. The Excell plant and Amarillo plan in Texas are no longer producing Grade A helium for the Bureau of Mines, but are now used to control the pressure in the helium storage reservoir (Excell) and to liquify helium (Amarillo).

8. Other relatively small capacity private plants producing Grade A helium, which are not connected by pipeline to the conservation system, are Linde Division of Union Carbide in Kansas and the Navajo plant of Western Helium Corporation in New Mexico.

9. Helium storage exists in both the pipeline system and the storage system reservoir at Cliffside. Once crude helium enters into the pipeline system, it is considered in storage and unless dedicated to fulfilling the requirements of the conservation contract is freely transferable from the Helex Company plant owners to the owners of the private Grade A helium producing plants.

10. A total of 33,760,506 Mcf of crude helium was acquired by the United States under the conservation program. Under the contracts, this helium was priced at $405,049,136.89, an average price of $12.03 per Mcf as shown in Table 2 below:

TABLE 2

HELIUM CONSERVATION CONTRACTS SUMMARY

| Company | Amount $ | Volume Mcf | Average Price $/Mcf |
|---|---|---|---|
| Northern Helex Co. | $ 51,864,201.12 | 4,475,921 | $11.5874 |
| Cities Service Helex, Inc. | 84,719,570.87 | 6,720,927 | 12.6053 |
| National Helium Corp. | 154,775,285.89 | 12,217,628 | 12.6682 |
| Phillips Petroleum Co. | 113,690,079.01 | 10,256,030 | 11.0852 |
| TOTAL | $405,049,136.89 | 33,670,506 | $12.0298 |

11. Of these amounts, Phillips conveyed to the United States 10,256,030 Mcf of helium, priced under the contract at $113,690,079.01, an average of $11.0852 per Mcf.

12. At the time of termination in 1973, the government had approximately 35 billion cubic feet of helium in storage in the Cliffside Field in Texas, and it was estimated that about four billion cubic feet of helium was contained in the government-owned native gas in that field. It was also estimated that approximately 5.5 billion cubic feet of helium would be recovered in the Keyes plant under its natural gas supply agreement. This assured the government a supply of 44.5 billion cubic feet of helium. As a result, the Secretary of the Interior found on February 2, 1973, that the objective of the Helium Act had been met. The objectives were to

"foster and encourage individual enterprise in the development and distribution of supplies of helium, and at the same time provide, within economic limits . . a sustained supply of helium which, together with supplies available or expected to become available otherwise, will be sufficient to provide for essential Government activities." 50 U.S.C. § 167m.

13. Approximately 42.8 billion cubic feet of helium is presently stored in Cliffside. Of this 42.8 billion, 32.2 billion was purchased under the helium conservation contracts; 1.5 billion was accepted in storage under court order; 3.5 billion was produced at Bureau of Mines plants; and 4.0 billion is contained in native gas. All of the approximately 34 billion cubic feet of helium acquired under the conservation program remains in storage at Cliffside. Assuming that the 34 billion cubic feet obtained from the conservation companies was worth $10 per Mcf, the government has an investment in the helium stored at Cliffside of $340 million. Assuming, again, that the invested money could draw 10 percent interest a year if properly invested, the United States is paying at least $34 million a year in interest to keep the helium in storage. The storage cost is about the largest cost item associated with the helium acquired under the conservation program.

*Refined Helium Market*

14. No relationship exists between Grade A helium prices and either the crude

helium sold by Phillips to the United States or the crude helium sold to the United States pursuant to any other conservation contracts. All such crude helium was placed in underground storage by the government and so remains. None has been refined into Grade A helium. It was not produced to supply current demands, but was produced to be saved and not wasted when the helium-bearing natural gas went to market. It is not known when the stored crude helium will be used; the purpose for which it will be used; nor the price at which it will be sold.

15. During the ten years involved in this case, approximately 92 billion cubic feet of helium was produced at the wellhead; 48 billion cubic feet of helium was not recovered, but instead was wasted into the atmosphere as the natural gas containing such helium was marketed. 44 billion cubic feet of helium was recovered in the United States, all of which was initially recovered as crude helium. Of this amount, 36 billion cubic feet was placed in underground storage by the government and remains there at this time. Of this 36 billion cubic feet in storage, 34 billion cubic feet represents all the crude helium sold by Phillips and the other conservation companies to the government. Of the 44 billion cubic feet of helium extracted and saved, only 8 billion cubic feet was refined into Grade A helium and only approximately 3.3 billion cubic feet was sold to private customers during the years in question. It is now clear that it would be improper to attempt to value the 34 billion cubic feet of conservation crude helium in storage by any price the 3.3 billion cubic feet of refined helium may have sold for. To do so would require the assumption that all of the 34 billion cubic feet of stored crude helium could have been refined and sold in the Grade A market. It is clear that such could not have been done without drastically reducing the price of Grade A helium.

16. The prices paid for Grade A helium during 1963 through 1972 are not sufficiently reliable as indications of value to serve as a starting point. It is uncontroverted that the government's 1961 price of $35.00 was adopted for the express purpose of creating sufficient income from government sales of refined helium to pay Phillips and the other conservation companies for the crude helium they were selling the government for storage, as well as to pay all other expenses associated with the storage program. Previous to that price, the government was selling Grade A helium to government users at $15.50 per Mcf and to private users at $19.00 per Mcf. The $35.00 price was never intended to represent a fair market value for helium. Nonetheless, the $35.00 price was the only price available during all of 1963, 1964, 1965 and a substantial portion of 1966. During those years there was only one other seller of Grade A helium (Kerr McGee), and one of Ashland's witnesses, then an employee of Kerr McGee, affirmed that Kerr McGee purposely fixed its price to be equal to the posted government prices—whatever they might be—so that whatever the government price was, the Kerr McGee price was also. The helium the government sold during the ten years involved herein was produced by the government itself and was not purchased from the Helex companies.

17. After 1966 there was little stability of Grade A prices. Although Grade A helium producers began operations in 1966 through 1968 and the prices which they charged were significantly less than $35.00 per Mcf, there was no particular proximity of prices. One seller of Grade A helium in 1966 (Kansas Refined Helium) sold its product for an average price of $16.37 per Mcf and in 1967 for $17.68 per Mcf. At the same time other sellers in 1967 were selling the same product for $25.57 and $35.00 per Mcf. A former Kerr McGee employee testified that he was personally familiar with an attempt to sell Grade A helium at $15.00 per Mcf in 1967. Weighted average Grade A helium prices charged by private parties f. o. b. the plant decreased from $25.39 per Mcf in 1966 to $20.21 in 1972, although Kerr McGee reduced its posted price to $19.00 in 1969 and maintained such until April 25, 1972.

18. During the 1962–1972 period the volume of Grade A refined helium sales varied substantially; sales of 611,000 Mcf in 1962 rose to 929,000 Mcf in 1969 and then steadily fell to 580,000 Mcf in 1972. As private companies began producing Grade A helium, the government's share of the commercial market continuously decreased from a high of about 135,600 Mcf in 1962 to a low of 6,279 Mcf in 1972.

### Crude Helium Market

19. There is now, and was at all times since the commencement of the conservation contracts, a market for crude helium. This market consists of all crude helium sold to the government for storage purposes under the Helium Conservation Act, as well as all sales and purchases between private parties, all within a fairly narrow range of prices. Phillips' Exhibits 43, 44 and 45 describe the details of very substantial crude helium exchanges. Exhibit 43 reflects that the government purchased, between 1963 and 1972, approximately 31,400,000 Mcf of contained helium. Private parties exchanged more than 675,000 Mcf in just slightly more than six years beginning in late 1966 and ending in 1972, and approximately 686,000 Mcf in the three years thereafter. The crude helium market was by far the largest helium market in existence during the ten years herein. Numerous witnesses, including representatives of many of the purchasers and sellers of crude helium, testified that a well defined market for crude helium existed. The president of National Helium stated that a crude helium market existed and continues to exist, as did the vice president of Northern Helex. Similar expressions were received from representatives of Cities Service and Kansas Refined Helium, crude helium's largest private purchaser. Each testified extensively regarding the circumstances of each sale, the volumes sold, the prices received and the contract terms generally.

### Phillips Contract Price

20. In the original trial of this case very little evidence was offered describing the negotiations which led to the contracts above-mentioned and, particularly, to the contract of November 13, 1961, between Phillips and the United States, and no relationship between the contract prices and any then existing markets or market values was developed of record. Credible written and oral evidence of these matters is now before the court.

21. As previously mentioned, the Phillips contract, which was the last of the four contracts to be negotiated with the Helex companies, resulted from intense negotiations between Mr. Henry Wheeler, the former Director of the Helium Conservation Program, representing the United States, and officials of Phillips Petroleum Company. Funds were available for only one more conservation contract with a crude helium producing company; and two companies, Phillips and Colorado Interstate, were both interested in acquiring a government contract. During negotiations with Phillips, Mr. Wheeler negotiated the price downward to $10.30 Mcf. Meanwhile, Colorado Interstate had offered to convey crude helium to the government at a price of $10.10 per Mcf. Despite the small price advantage offered by Colorado Interstate, Mr. Wheeler selected Phillips Petroleum because by doing so a greater volume of helium would be conserved.

22. Article 7.4 of the Phillips' contract provided that the United States would indemnify Phillips for any amount over approximately $3.00 per Mcf which Phillips might be required to pay third parties for acquisition of the commingled helium. Phillips had not requested that this indemnification be placed in the contract. Mr. Henry Wheeler testified that the clause was included so that the government would be treating all of the contractors alike. The testimony of Mr. Wheeler and Mr. Cullender, a member of the Phillips team that negotiated the contract, and the deposition of Mr. Wilson, the negotiator for National Helium, all established that Article 7.4 had no influence whatsoever on the price the United States paid for crude helium. The evidence reflects that Phillips believed it

had title to the helium when it entered into the contract, that it did not request the indemnity provision, and in fact, did not consider its effect.[22]

Originally, Phillips had submitted a written proposal of $11.48 per Mcf wherein it offered to warrant its title. The government rejected such offer because it thought the price too high. The government countered with its own proposed contract, suggesting a figure of approximately $10.30 per Mcf. Such proposal contained no provision for title warranty by Phillips, but instead included the government indemnity clause discussed earlier. Neither side's actions evidenced a belief that the title question raised any issue of serious economic import.

23. The $10.30 price in the Phillips contract, adjusted only by the price index provision in paragraph 7.3, was deemed by both Phillips and the government as the complete price and value of the crude helium. The indemnity provision was not deemed or intended by either as part of the purchase price. Similarly, the National Helium negotiator testified that in his opinion the contract price agreed between the government and National Helium was exactly representative of the crude helium's value at the time of the execution of the contract.

In addition, the United States' power of condemnation does not appear to have been a factor in the negotiation of the conservation contracts, since use of such power was neither threatened nor suggested. Phillips' concern was not that the United States would seek to condemn the helium, but, rather, that the United States would enter into a contract with some other party for the purchase of crude helium and thereby deny Phillips the opportunity to sell its helium to the United States.

24. As noted above, in 1966 several sales of substantial quantities of crude helium occurred between private parties, and sales

continued to be made during all the years in question. In all instances the sellers sold the crude helium for prices comparable to those set forth in the conservation contracts and at least four substantial sales between 1967 and 1972 involved full title warranty by the seller. These sales with full title warranty strongly indicate that the conservation contract prices were not unduly low and were not forced downward by the presence of the indemnification clauses. The indemnification clauses caused no one to undervalue the helium.

*Processing Costs*

25. Effective application of the workback method requires that the proper costs be deducted from the proper starting value. In this case the relevant costs are all helium plant expenses allocable to helium production, plus an appropriate return on the amount of capital employed in such production.

26. Disputes between the parties on "cost" issues include disagreements as to the amount of plant expenses allocable to helium, the amount of capital allocable to helium, the rate of return to be allowed and whether in calculating this rate of return there should be included a sum sufficient to cover income taxes.

27. Phillips' accounting witness utilized essentially the same "capital employed" and plant expenses used by Ashland's accounting witness but made certain adjustments thereto. These adjustments to "capital employed" entailed:

(a) an increase in the amount of working capital based on Phillips' actual working capital;

(b) provision of a return on deferred testing (start-up) costs which were amortized over the life of the contract;

(c) inclusion of accounts receivable Phillips was required to finance and for which there was no provision for interest.

---

22. In any event, more than one-half of the helium sold by Phillips to the government was not covered by Article 7.4 for it was produced from Phillips' own gas wells. Since paragraph 7.4 is irrelevant as to Phillips owned gas, the sale of helium produced by Phillips from its own wells represents a substantial comparable sale which clearly supports the use of Phillips' contract price as the starting value.

These changes reflect an accurate and appropriate approach in this case for computing "capital employed."

Ashland has never complained that Phillips was an inefficient helium extractor and in fact the evidence is quite to the contrary. Therefore, there is no justification for plaintiff's suggested approach of using Phillips' actual costs in some instances, while applying a formula for determining working capital when Phillips' actual working capital appears to plaintiff to be larger than needed.

28. Determination of the return rate properly allowable to Phillips involves ascertainment of the return rate necessary at the time to induce Phillips' management to make the initial investment. Each of the experts testifying on the return issue for Phillips and the government was actually engaged during the period in question in the investment decision-making process of substantial corporations, and each testified that the minimum rate of return necessary to have caused a knowledgeable investor to make the investment made by Phillips was 15 percent after taxes. The testimony of Phillips' employees fully supports this conclusion.

The court finds that the prospect of a 15 percent after-tax return was required to induce Phillips or any other knowledgeable investor to enter into the contract involved here. Phillips' helium plant costs should, therefore, include such a return.

29. To effect the appropriate after-tax return, monies paid in income taxes should be included as a cost item. Failure to include income taxes would, under the workback method of valuation, place too high a value on the helium at the wellhead.

30. The issue of expenses properly allocable to hydrocarbon production results from the fact that helium plant operations concentrate liquefiable hydrocarbons contained in the natural gas processed at the helium plants. These concentrated liquefiable hydrocarbons leave the helium plant in what is termed the "rich gas stream," which then enters a gasoline plant where further processing and extraction of liquefiable hydrocarbons occurs. The efficiency of the gasoline plant is improved by the helium plant's concentration of the liquefiable hydrocarbons.[23]

31. The court finds that allocation of helium plant expenses to the production of hydrocarbons should be based on the "functional cost benefit method" proposed by Phillips. Helium plant investment and expenses should be allocated between crude helium production and production of the rich gas stream. Phillips' method of allocation results in an allocation of helium plant costs on an equitable basis and in a logical manner. The incremental liquids credit proposed by Ashland is subject to various compelling criticisms, both as to the basis for its calculations and its potentially inequitable results.

### Fair Market Value

32. In 1977, of the total 6.92 billion cubic feet of commingled helium produced, a mere 1.38 billion cubic feet was recovered.

**23.** Ashland contends that the net value of the additional liquids (called incremental liquids by Ashland) should be used under the by-product cost accounting method to reduce the cost of helium extraction. On its exhibits Ashland adds the net value of these incremental liquids to the wellhead value of the helium but the effect is the same as subtracting these net liquid values from the cost of helium extraction before determining the wellhead value of the helium. Phillips contends that Ashland has not properly calculated the volume of what it calls incremental liquids in that the base period selected by Ashland does not actually reflect what the liquid recovery would have been in succeeding years had the helium plants not been built and that Ashland has been arbitrary in its determination of the incremental liquids inasmuch as it has failed to take into account the fact that processing the natural gas through the helium plants actually caused a reduction in the recovery of the most valuable of these liquid products. Phillips contends that Ashland has already received the benefit of Phillips' cost savings and that no allocation of expenses to hydrocarbon production is necessary. Furthermore, Phillips contends that if an allocation of helium plant expenses to the production of hydrocarbons must be made, then the allocation should be made on the basis of a functional benefit cost study.

This small recovery results from helium's market demand being tremendously over-matched by available supplies. For example, even though cheap storage of helium is available at Cliffside, Cities Service Helex, one of the companies with the existing capacity to recovery helium, is simply venting it to the atmosphere despite being connected to the conservation system. Neither the National Helium plant at Liberal nor the Phillips-Dumas plant are producing crude helium for storage.

33. In excess of 188 billion cubic feet of contained helium in proved or probable reserves of helium-rich gas (containing 0.3 percent helium or more) had been identified as of 1977. Of that 188 billion cubic feet, 105 billion cubic feet is in non-depleting reserves, i. e., it is either in storage at Cliffside or is contained in natural gas of a low heating value which is not being produced.

34. A $2.00 per Mcf price for commingled helium was used by the Bureau of Mines in computing the price it was willing to pay under the helium conservation program. The four Helex companies in good faith believed that they owned the helium contained in the natural gas and accepted $2.00 per Mcf as the value of the commingled helium.

35. Dr. Leo Garwin, witness for Ashland, authored an article published in the April, 1969, issue of "Hydrocarbon Processing," wherein he stated that the helium content in natural gas "is normally worth between $2.00 and $3.00 per Mcf. Similarly, in a letter dated September 12, 1969, to the Chairman of the House Committee on Interior and Insular Affairs, Dr. Garwin referred to the value of helium contained in natural gas as $2.00 to $3.00 per Mcf; and in 1967 Dr. Garwin testified on behalf of Ashland at an arbitration proceeding that the value of helium contained in natural gas owned by Ashland was $2.35 per Mcf.[24]

## CONCLUSIONS OF LAW

1. This court's responsibilities and duties on remand are set forth in the appellate opinion in this case rendered subsequent to the first trial. *Ashland v. Phillips,* 554 F.2d 381 (10th Cir. 1975).

2. Ashland's suit for the reasonable value of the helium in controversy here is, in effect, an action in quantum meruit. *See Phillips Petroleum Co. v. Texaco, Inc.* 415 U.S. 125, 94 S.Ct. 1002, 39 L.Ed.2d 209 (1974).

3. The court of Civil Appeals for the State of Texas, the state where this action was commenced, has observed:

"quantum meruit, [is] a creature of equity, . . ." *University State Bank v. Gifford-Mill Const. Corp.,* 431 S.W.2d 561 (Tex.Civ.App.1968).

That court has further held that quantum meruit actions "rest their holdings upon equity and justice" and that recoveries thereunder require "equity and justice." *Ochiltree County v. Hedrick,* 366 S.W.2d 866 (Tex.Civ.App.1963).

4. Strict adherence to exact mathematical formulations which fail to encompass the equities in this case is inappropriate. The Court must seek equity and justice for all parties.

5. For example, the wellhead values for helium extracted at the two plants for the years 1963–1971 vary from a minus $.40 per Mcf to $5.34 per Mcf of helium. Additionally, the values of helium vary from plant to plant for exactly the same year; the value of the helium extracted from the Sherman plant in 1968 was $4.34 and the value of helium extracted from the Dumas plant for the same year is $.41 per Mcf. The court believes this clearly illustrates that rigid application of mathematical calculations under the work-back method would render fractured and inequitable results.

6. Equitable considerations indicate that a single uniform value for commingled helium should be applied to all of the helium extracted at both the Sherman and Dumas plants for each year.

24. Tr. 838–848; United States Exhibit Nos. 36, 37; Dr. Garwin, supra.

7. The reasonable value of the helium commingled at the wellhead should be the sum that would have resulted from fair negotiations between an owner willing to sell and a purchaser desiring to buy. *Standard Oil Company v. Southern Pacific Company,* 268 U.S. 146 at 155, 45 S.Ct. 465, 69 L.Ed. 890 (1925).

8. Based upon all of the oral and documentary evidence presented by the parties during this trial and the first trial, the court concludes that the reasonable value of the commingled helium is $3.00 per Mcf of contained helium for each and every year that helium was produced, regardless of the plant from which it was produced.

9. Plaintiff Ashland is entitled to judgment against defendant Phillips as to the 72,748 Mcf of contained helium at issue in this case, in the amount of $218,244.00.

10. Generally, interest is awarded only where the amount involved is liquidated. *Palmer v. Radio Corporation of America,* 453 F.2d 1133 at 1140 (5th Cir. 1971). Previous to judgment herein, the amount owed Ashland has remained unliquidated. Phillips asserted a good faith and persuasive title claim to the commingled helium previous to the opinion in *Northern Natural Gas Company v. Grounds, supra.* Subsequently, the helium's value has remained very much in dispute.

Ashland is entitled to interest as of the judgment date herein, as provided by law.

An appropriate judgment will be entered herein.