**NORTHERN NATURAL GAS COMPANY, et al. (Helex Group),**

v.

**Ralph GROUNDS, et al. (Landowners Group), and Socony Mobil Oil Co., et al. (Lessee-Producer Group).**

Nos. 74–1886 to 74–1894, 75–1014 to 75–1035 and 75–1051 to 75–1061.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Aug. 19, 1981.

Decided Nov. 16, 1981.

Rehearing Denied Jan. 19, 1982.

---

**4.** We do not express an opinion as to the merits of appellant's claim for damages.

Emmet A. Blaes of Jochems, Sargent & Blaes, Wichita, Kan. (Wendell J. Doggett, Houston, Tex., and C. A. Conoley, Kansas City, Mo., with him on the brief), for National Helium Corp. and Panhandle Eastern Pipe Line Co.

Clifford L. Malone and Mark H. Adams, II, of Adams, Jones, Robinson & Malone, Chartered, Wichita, Kan. (Mark H. Adams, Wichita, Kan., with them on the brief), for Northern Natural Gas Co., Northern Helex Company, Northern Gas Products Co., Cities Service Gas Company, Cities Service Cryogenics, Inc., and Cities Service Helex, Inc. (Dean Wallace and Patrick J. McCarthy, Omaha, Neb., with them on the brief, for Northern Companies).

James B. Diggs, Oklahoma City, Okl., for Gulf Oil Corp.

Jack D. Sage of Hershberger, Patterson, Jones & Roth, Wichita, Kan. (Richard Jones, Wichita, Kan., with him on the brief), for Mobil Oil Corp., MAPCO, Inc., The Superior Oil Co. and Diamond-Shamrock Corp.

R. H. Landt, Denver, Colo. (Glenn D. Young, Jr., Wichita, Kan., with him on the brief), for Amoco Production Co.

Gerald Sawatzky of Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., for Ashland Oil, Inc., Atlantic Richfield Co., Cabot Corp., Dorchester Gas Producing Co., Helmerich & Payne, Inc., and Texaco, Inc. (Arloe W. Mayne and Douglas C. Brandon, Ashland, Ky., for Ashland Oil, Inc., James R. Coffee, Dallas, Tex., for Atlantic Richfield Company, William C. Charlton, Houston, Tex., for Cabot Corporation, Leon C. Gavras, Tulsa, Okl., for Helmerich & Payne, Inc. and J. Frederick Lawson, Tulsa, Okl., for Texaco, Inc., with him on the brief).

Joseph W. Kennedy of Morris, Laing, Evans, Brock & Kennedy, Wichita, Kan. (Kenneth Heady, Gen. Counsel, C. J. Roberts, Associate Gen. Counsel, Don L. Jemison, Bartlesville, Okl., and L. K. Smith of Boone, Smith, Davis & Hurst, Tulsa, Okl., on the brief), for Phillips Petroleum Company.

Gerrit H. Wormhoudt, Wichita, Kan. (Dale M. Stucky and Donald R. Newkirk, Wichita, Kan., with him on the brief), for Ralph Grounds, O. W. Hegler, et al. (Landowners Group).

Laura Frossard, Atty., Dept. of Justice (Carol E. Dinkins, Asst. Atty. Gen., Jacques B. Gelin and Andrew F. Walch, Attys., Dept. of Justice, Washington, D. C., with her on the brief), for United States of America.

Before SETH, Chief Judge, and McWILLIAMS and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

Consolidated Helium Cases II

The difficult issue determined by the United States District Court for the District of Kansas in its judgment of December 16, 1974, presented for our review involves the question of the reasonable value of the helium content of processed natural gas to be paid by the processors-extractors to the lessee-producers, who, in turn, must account by royalty payments to the landowners.

The appeal of these consolidated cases from the United States District Court for the District of Kansas, known as *Consolidated Helium Cases II* or *Grounds II*, was consolidated for *en banc* briefing, hearing and argument with an appeal from the United States District Court for the Northern District of Oklahoma in a case entitled *Ashland Oil, Inc. v. Phillips Petroleum Company*. The consolidated cases involved one dominant, identical issue, *i. e.*, the determination of the value of the helium content of processed natural gas for accounting-payment purposes. The *en banc* hearings before this court were held November 17, 1976. This court's *en banc* opinion dealt with many issues presented and in common in the separate appeals.

The *en banc* opinion resulted in a remand directly and exclusively to the Oklahoma district court. The *en banc* opinion was titled *Ashland Oil, Inc. v. Phillips Petroleum Company*, 554 F.2d 381 (10th Cir. 1977), *cert. denied*, 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 456 (1977), hereafter referred to as *Ashland I*. The Kansas appeal was held in

abatement. The practical consideration for the use of the abatement procedure was to employ only one district court initially for a redetermination of the helium valuation pursuant to the specific guidelines, directions and instructions contained in *Ashland I*. It was believed that further Oklahoma district court proceedings would serve to resolve the valuation issue in the related cases.

On remand, the Oklahoma district court held a trial to determine the valuation issue. The court found, *inter alia*, that: the proper starting value for use of the work-back method of valuation was not the market value of Grade A helium, but the market value for crude helium, which is helium after it is separated from the natural gas stream, but yet mixed with nitrogen and other gases; the contract price of approximately $10.30 m.c.f. for which the United States purchased crude helium from Phillips Petroleum Co. was a fair price for crude helium, and was, accordingly, a proper price to use as a starting value; after deducting various processing costs, the work-back method resulted in a value of the commingled helium at the wellhead between $2.50 and $5.50 per m.c.f.; because the action was equitable in quantum meruit, the "rigid applications of mathematical calculations" were not pertinent, and $3.00 per m.c.f. as a single uniform value of the contained helium for each year was proper; Ashland was not entitled to prejudgment interest because the amount owed to Ashland had been unliquidated and in good faith dispute, and; Ashland was entitled to postjudgment interest from date of the judgment on remand. *See Ashland Oil, Inc. v. Phillips Petroleum Co.*, 463 F.Supp. 619 (N.D.Okl. 1978).

On appeal, this court affirmed the $3.00 value arrived at by the district court's use of the work-back method and the court's award of post judgment interest from the date of the judgment on remand. We reversed, however, the district court's denial of prejudgment interest on the ground that its allowance was the law of the case. Thus, the cause was again remanded for the entry of judgment to include prejudgment interest. *See Ashland Oil, Inc. v. Phillips Petroleum Co.*, 607 F.2d 335 (10th Cir. 1979), *cert. denied*, 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980), hereafter referred to as *Ashland II*.

In our *Ashland II* opinion, we said:

This case was remanded for the development of additional facts relating to and to provide a basis for the valuation of the helium at the wellhead by the use of a work-back method. See *Ashland Oil, Inc. v. Phillips Petroleum Co.*, 554 F.2d 381 (10th Cir.). The trial court was to determine a proper starting place and value for such method, the plant cost, return on investment, the costs chargeable to production of liquid hydrocarbons, and related facts.

On remand the trial court selected as a starting point the stated value of helium used in the contract between Phillips and the Government. For a brief description of the contract, see 554 F.2d, at 384. This determination by the court was based on the expert testimony relating to pure helium values and other possible starting points for the valuation of helium. *A starting place for the work-back method can be at any point in the production—processing—sale chain where a dollar figure can be established by reliable evidence, and which may be demonstrated to be a realistic value.* We see no objection to the use of the contract value for this purpose. It was a negotiated figure arrived at by parties dealing at arm's length. There may have been other considerations involved, but on remand these do not appear to have been substantial enough to cast doubt for our purposes on the contract price. This figure was not greatly different from those used in contracts for other extraction plants.

Using this figure the trial court made findings as to plant investment and rate of return. These factual determinations were made after a consideration of the testimony and are supported by the record. The appellant urges that there are factors which should not have been included in the plant cost figure or in the

total "capital employed" upon which Phillips was entitled to compute a return. However, again this was a fact-finding element, and the result was supported by the record. [Emphasis supplied].

607 F.2d at p. 336.

On January 15, 1981, the district court in Oklahoma entered an order in the *Ashland* case directing that prejudgment interest be calculated on the value of the helium determined on the last day of each year and that interest at the rate of six percent per annum be calculated thereon. That determination was appealed by Ashland and consolidated with the matters here involved in *Consolidated Helium Cases II* or *Grounds II* arising from Kansas. The parties, per request of this court, submitted supplemental briefs addressing both the legal and factual developments which have taken place since *Helex II* or *Grounds II* was argued before this court en banc on November 17, 1976. Our discussion of the issues shall be confined, to the extent possible, within that time frame.

Part I of this opinion is a brief review of the helium conservation program. It may aid in placing in focus the difficult problems with which the various parties and the courts have been confronted.

We will not treat and consider the arguments and contentions raised by the parties prior to our en banc hearing of November 17, 1976, leading to our en banc opinion in *Ashland I* except to the extent necessary here. This is so because many of the applicable rules of law have been announced and settled by our *Ashland I* and *Ashland II* and these rules now constitute the law of the case in *Helex II* or *Grounds II* before us here. With this background, we have elected to dispose of the matters on this appeal, in this manner:

(a) *Part II* discusses the contentions of the parties on the valuation methods-procedures and that adopted by the trial court. We conclude that the District Court erred in rejecting the "work back" method of valuation computation directed by this Court's en banc opinion in *Ashland I* and thereafter reaffirmed in *Ashland II*.

(b) *Part III* holds that $2.00 per m.c.f. is the minimum, the floor, to which the lessee-producers and landowners are entitled.

(c) *Part IV* holds that the District Court did not err in the award of prejudgment interest.

I.

Helium is an unusual element, noncombustible and the second lightest known element. It is so inert that it will not chemically react or combine with other elements. During the past 25 years it has become of growing importance to national defense, science and industry.

During World War I, large volumes of helium were used for lighter-than-air aircraft. Thereafter, helium found important uses in the field of medicine and for diving and submarine operations. During World War II, helium was vital in the development of atomic energy and as a shield in arc-welding of such metals as magnesium, aluminum, and stainless steel. It is now very important in the fields of nuclear and cryogenic research and in industrial applications.

In 1958, a report submitted by a group chaired by then Undersecretary of the Interior O. Hatfield Chilson observed that the only practical method of conserving helium which would otherwise be wasted to the atmosphere was to construct and operate helium plants to extract helium from helium-bearing natural gas which is essentially concentrated in four fields, to-wit: (1) the Hugoton Field of Texas, Oklahoma and Kansas, (2) the Panhandle Field of Texas, (3) the Keyes Field of Oklahoma, and (4) the Greenwood Field of Kansas. These fields contain 99% of the nation's recoverable supply of helium.

The Chilson report bore fruit in the enactment of the 1960 Helium Act Amendments, 50 U.S.C.A. § 167 *et seq.* This legislation authorized the Secretary of the Interior to enter into long term contracts to acquire, process, transport or conserve helium for a period not exceeding 25 years. The Bureau of Mines was directed to con-

tract with private industry plants having under their control or access volumes of gas with sufficient helium content to justify economic extraction. These contracts were entered into expeditiously in order to prevent waste of the helium, inasmuch as the 1960 Amendments required that all contracts made by the Secretary for the purchase of helium from private plants contain provisions for bidding the sale of helium to any purchaser other than the United States at a price lower than the lowest price paid by the United States (subsequently set by the Secretary at $35.00 per m.c.f.) for helium produced from any private plant.

It was not possible for the United States to undertake extensive title checks prior to contracting in order to determine the landowners and their interests (some 30,000) and the lessee producers (several hundred) in view of the urgency in conserving the helium, which some have estimated will be depleted in the aforementioned fields by the year 1985. Thus, waste was prevented and the United States obtained possession of the helium from the purchasers-processors under various contracts. Any litigation relative to value and divisions of interests involving landowners and lessee-producers was, in effect, postponed "until another day".

Some of the "postponed" knotty legal problems were in large measure addressed and decided in *Northern Natural Gas Company v. Grounds,* 441 F.2d 704 (10th Cir. 1971), *cert. denied,* 404 U.S. 951, 92 S.Ct. 268, 30 L.Ed.2d 267 (1971), *cert. denied,* 404 U.S. 1063, 92 S.Ct. 732, 30 L.Ed.2d 751 (1972), *reh. denied,* 404 U.S. 1065, 92 S.Ct. 732, 30 L.Ed.2d 754 (1972), sometimes referred to as *Consolidated Helium Cases I* or *Grounds I.* There, the basic legal relationships were defined and controlling rules were laid down. We there held that the Helex companies (purchasers-extractors) " ... must account to the lessee-producers for the reasonable value of the helium contained in the processed gas and the lessee-producers must pay royalty on such value to the landowners." 441 F.2d at p. 707. We reversed and remanded.

The consolidated appeals heard *en banc* November 17, 1976, include the instant appeal which is the result of the Kansas district court's proceedings following reversal and remand in light of *Grounds I.*

Following the remand, the further proceedings resulted in the decision of the Kansas district court which is the subject of this opinion.

II.

The Helex Group are the corporations which transport through pipelines the natural gas from the lessee-producers to their extraction plants where the helium is extracted and sold to the United States. These companies were fully aware, during the course of the 1974 proceedings in Kansas upon remand, that in the 1973 Oklahoma proceeding the work-back method of valuation had been employed. Even so, the Helex companies opposed the work-back method in the Kansas case and did not contend, alternatively, that the base contract price should be the valuation starting point.

The District Court likewise rejected the "work back" method of valuation, and specially rejected the theory of valuation advanced by the lessee-producers and landowners. The court found/observed:

Briefly stated, the sole theory of value offered by Lessee-Producers and their co-parties in interest, the Landowners, was based upon the premise that there were no comparable sales of commingled helium at the wellhead by which value could be ascertained, and that therefore, the proper method to arrive at value was to use a "proceeds less expense" approach to the question, so as to "work down" to a proper figure. In applying this theory, the Lessee-Producers urge that the first free, open, competitive market is that of sale of Grade A helium, the state in which helium is bought by and sold to, the ultimate consumer. Thus, the Lessee-Producers start their "work down" approach, not with the *actual* proceeds received by the Helex companies from sales of conservation helium to the Bu-

reau of Mines, which was approximately $12.00 per Mcf for contained helium in the crude helium mixture, but rather with a figure of $20.00 per Mcf which they represent to be a conservative, average estimate of the "market value" of Grade A helium sold to ultimate consumers during the years 1963–1971.

From this figure of $20, the Lessee-Producers would deduct the "cost of purification" of crude helium into Grade A helium, estimated to be $2.00 per Mcf, and then subtract "costs of extraction", to arrive at a final value for the helium content of the gas stream processed in each individual Helex plant for each of the several years.

The "costs of extraction" [LPX 2–19] were computed by taking operating expenses from company records (with certain adjustments believed to be required by Lessee-Producers' experts), adding on a figure which the producers considered to be a "fair rate of return" on the Helex companies' investments," and then deducting from these expenses a figure determined to be a "by-product liquid credit", which was arrived at by computations concerning profits realized by the Helex companies from their liquid hydrocarbon extraction operations, which were carried on in conjunction with helium extracting activities.

[R., Supp. Vol. I, pp. 44–45]. [Footnotes omitted].

■ We must hold that the District Court erred in rejecting the "work back" method of valuation computation directed by this court's en banc opinion in Ashland I, supra, and thereafter reaffirmed in Ashland II, supra.

The record does not evidence any material, significant differences between the contracts and contractual relationships existing between the parties involved in the Kansas and Oklahoma proceedings. The significant difference in the evidence presented in the two cases, and that relied on primarily by the Kansas district court in rejecting the "work back" method was the testimony of one Dean Bowers, of Dallas, Texas, a pro-

fessional registered chemical engineer and a consultant who is an expert in the economic evaluation of analysis of oil and gas processing procedures. Bowers pointed to the wide variation in the contained helium in the gas stream at the various processing plants which, in turn, resulted in a substantial difference, from plant to plant, in the ultimate cost of recovery. He stated that the key factor in the plant-to-plant calculation was the measure of reduced recovery costs resulting in higher helium content. In basic reliance of the Bowers' evaluations-computations, the District Court found that the reasonable value of the helium content at "the time and at the point" it was delivered to the Helex companies was between 60 cents per m. c. f. of helium and 70 cents per m. c. f. of helium, calculated annually between 1961 and 1972.

In rejecting the "work-back" method, the District Court did not find that there were comparable sales which establish a market price or value for commingled helium, but rather because the court determined that "work-back" from the value of the refined Grade A helium " . . . is simply unreasonable and that determination of the value of 'raw materials' is not determined upon a 'proceeds less expense' theory in the American economy." Northern Natural Gas Co. v. Grounds, 393 F.Supp. 949, 982 (D.C.Kan. 1974). This finding is anchored to the opinion expressed by Dean Bowers.

The "work back" method became the law of the case as a result of our en banc opinion in Ashland I. The record before us from the Kansas court does not establish evidence of comparable sales for the determination of market price or value for the commingled helium. The evidence in this regard, i. e., comparable sales, consisted of the same purchase contracts, with the exception of two, which this court reviewed and found to be non-comparable in Ashland I. The two contracts not previously considered by this court in Ashland I are both post-litigation generated. Thus, they do not, as contended by the Helex companies, constitute a wealth of comparable sales in addition to those before this court in Ash-

*land I.* In any event, the Kansas court did not expressly find that any of these contracts established comparable sales. Instead, the court simply observed that the contracts do not contain any provisions relating to price adjustments involving the extraction of helium.

We must reject the Helex companies' further contention that their proffered 41 FPC rate scheduled contracts filed with FPC and the some 25 intrastate gas purchase contracts are examples of comparable sales in addition to those offered in *Ashland I.* They do not render vulnerable our prior holding that such contracts do not meet the measure of comparable sales. They are, we hold, as non-comparable as the contracts considered in *Ashland I.* Accordingly, the work-back method applies with full force in the case at bar. In *Major v. Benton*, 647 F.2d 110 (10th Cir. 1981), we observed:

> ... When a court enunciates a rule of law in the course of a given case, the law of the case doctrine generally requires the court to adhere to the rule throughout the proceedings. 1B Moore's Federal Practice ¶ 0.404(1) at 402–03. The rule is one of expedition, designed to bring about a quick resolution of disputes by preventing continued reargument of issues already decided.... Unlike *res judicata*, the rule is not an "inexorable command," but is to be applied with good sense .... Courts have generally permitted a modification of the law of the case when substantially different, new evidence has been introduced, subsequent, contradictory controlling authority exists, or the original order is clearly erroneous.
>
> 647 F.2d at p. 112.

The case must be remanded with instructions that the District Court employ the "work back" method mandated by the court's *en banc* opinion in *Ashland I* as the proper method of determining the value of the processed helium. We do not here determine the proper starting point for such work-back valuation. In *Ashland II*, the stated value of helium used in the contract between Phillips and the United States was selected by the District Court as the starting point. In affirming, we said:

This determination by the court was based on the expert testimony relating to pure helium values and other possible starting points for the valuation of helium. *A starting place for the work-back method can be at any point in the production—processing—sale chain where a dollar figure can be established by reliable evidence, and which may be demonstrated to be a realistic value.* We see no objection to the use of the contract value for this purpose. It was a negotiated figure arrived at by parties dealing at arm's length. There may have been other considerations involved, but on remand these do not appear to have been substantial enough to cast doubt for our purposes on the contract price. This figure was not greatly different from those used in the contracts for other extraction plants. [Emphasis supplied].

607 F.2d at p. 336.

### III.

In *Northern Natural Gas Company v. Grounds*, 441 F.2d 704 (10th Cir. 1971), (*Grounds I*) we observed that: the question of title to helium arose during the contract negotiations between the Helex companies and the Bureau of Mines following the 1960 amendments to the Helium Act; *the Helex companies agreed to warrant title and indemnify the United States for all ownership claims of third parties*; however, the ultimate cost each seller might have to bear was, per contract, limited to $3.00 per m. c. f. of helium and should the seller be required to tender in excess of $3.00 per m. c. f. in satisfaction or settlement of claims, the United States agreed to reimburse the seller for all sums in excess thereof. We pertinently stated, in footnote 2:

> A March 5, 1962, memo by the U.S. General Accounting Office regarding negotiations of helium contracts contains this statement: "Mr. Wheeler [Assistant Director, Helium, Bureau of Mines] advised that in cost negotiations, the contractors were allowed, as part of the unit price, a helium payment of about $2.00 a

thousand cubic feet (MCF) of helium delivered because the natural gas companies believed that they could not warrant clear and unrestricted title to the helium. The companies contended that the gas rights owned permitted them to sell natural gas and not helium. *Therefore, in order to provide for possible future payments to lessees, the companies insisted upon a helium payment of $2.00 a MCF for helium delivered.* Although there has not been any known cases on this subject, Mr. Wheeler stated that, in essence, this payment provides for a *contingency* in the event that (1) the companies are sued by lessees, (2) the court renders a decision that the companies do not have clear title to the helium contained in natural gas and (3) the companies are liable to third parties for the helium extracted from natural gas (Over the life of the four negotiated contracts, this helium payment will amount to an estimated $125 million.)" [Emphasis supplied].
441 F.2d at pp. 709, 710.

In *Ashland I, supra,* this court also held that, absent specific reservations, the grant of gas by the subject leases covered all components of the gas, including helium which would entitle the landowners-lessors to one-eighth (⅛th) of the proceeds of the helium marketed from each well ". . . if sold at the well, or, if marketed by lessee off the leased premises, then, one-eighth (⅛) of the market value thereof at the well. . ." That *Ashland I* considered and settled the right and interest of the lessors and lessees to the value of helium was confirmed in our opinion in *Ashland II*:

Our opinion in the *Consolidated Helium Cases (Ashland I)* requires that this division be in accordance with the lease terms and thus the same division as applied to the hydrocarbons. The judgment of the trial court making an equal division between lessor and lessee of the proceeds attributable to helium values must be and is reversed with direction to enter judgment providing for a division in accordance with the terms of the leases, and the terms of other agreements relating to the share of production, or payment for shares of production, if such be applicable.
554 F.2d at p. 392.

The United States, in its opening brief, pointed to a number of contracts entered into between the United States and private companies for the purchase of natural gas for processing, with various provisions relating to the value of extracted helium. Significantly, the United States pointed to these prices it paid under contracts for extracted helium: $2.00 per m. c. f. to Colorado Interstate Gas Company under a 1958 contract; between $1.55 to $2.99 per m. c. f. for helium extracted at the Government's Shiprock, New Mexico, plant; $1.55 per m. c. f. to Stanolind Oil and Gas Company under a 1955 contract; $2.00 per m. c. f. to Pan American Production Company under a 1959 contract; and $2.00 per m. c. f. to Continental Oil Company under a 1962 contract. [Brief of United States, pp. 14–16]. This section of the Government's brief concludes with this statement: "The United States has never paid more than $2.35 per mcf for the helium constituent of natural gas processed at any of its plants, including shrinkage, except the judicially determined value of $2.99 per mcf at the Shiprock Plant." [Brief of United States, p. 16].

We have heretofore observed that the United States, in its contracts with the Helex companies, included in the build-up of the prices it paid for crude helium the sum of ". . . $2 per Mcf for helium 'contained in the natural gas delivered at the extraction plant for processing.' " *Grounds I,* 441 F.2d at p. 717. Following this observation, we pointedly stated that we express no opinion what the *actual value* of the contained helium is, except that the helium value in the volumes of natural gas processed in the plants results in a price substantially higher than the FPC service rate. 441 F.2d at p. 717. The Kansas district court recognized the Government's agreement to pay the $2.00 per m.c.f. in its 1958 contract with Colorado Interstate Gas Company at the Keyes plant. 292 F.Supp. at pp. 669–772.

The $2.00 per m.c.f. was, as between the United States and the Helex Group, understood to be the floor, the minimum to which the lessee-producers and landowners were entitled. Thus, we hold that it is money had and received by the Helex companies for the use and benefit of the landowners and lessee-producers as the minimum of their entitlement. *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956); *Atlantic Coast Line Railroad Co. v. Florida*, 295 U.S. 301, 55 S.Ct. 713, 79 L.Ed. 1451 (1935). There is no room for doubt, in our view, that the contracting parties intended that third persons should receive the benefit of the $2.00 per m.c.f. as the *minimum* entitlement. In determining whether a third party has a beneficial interest in a contract which will entitle him to sue thereon, the intent to benefit the third party is generally controlling and it is to be gathered from a construction of the contract in the light of all surrounding circumstances showing such an obligation. *Jett v. Phillips & Associates*, 439 F.2d 987 (10th Cir. 1971), *Cox v. Fremont County Public Building Authority*, 415 F.2d 882 (10th Cir. 1969); *Corn Construction Co. v. Aetna Casualty and Surety Co. of Hartford*, 295 F.2d 685 (10th Cir. 1961); *Hamill v. Maryland Cas. Co.*, 209 F.2d 338 (10th Cir. 1954).

The District Court did not directly address the legal significance of the $2.00 per m.c.f. payment by the United States to the Helex companies. The Court did, however, reject the contention of lessee-producers that the provisions in the conservation contracts relating to indemnification by the United States to the Helex companies for crude helium payments beyond $3.00 per m.c.f. were "open ended" in that they would allow unlimited escalation of the price to be paid by the United States. The court found that these provisions, i. e., indemnification by the United States to the Helex companies for sums beyond ". . . an approximate $3.00 per mcf title liability exposure limit, continue to be just that—indemnity arrangements between the Helex group and the United States, which inure solely to the benefit of the Helex group and not to third

parties. The court has therefore determined that any indemnity arrangements which exist between the government and the Helex group are irrelevant to the question of determining 'reasonable value' of the commingled helium in question." [R., Supp. Vol. I, p. 65]. While we agree that the indemnity arrangement is not relevant to determination of the reasonable value of commingled helium, we must respectfully hold that the court erred in finding that provisos relating to sums beyond the $3.00 per m.c.f. "title liability exposure limit" were not inserted in the contracts for the benefit of third parties. Clearly, there was no other reason for their insertion. When the United States and the Helex companies contracted they were fully aware that the "postponed" knotty legal problems of title and accounting would, of certainty, confront them. It was in this precise setting that the $2.00 per m.c.f. "floor" was established with further provision for assumption of "the risk" of payments to third party claimants for royalties attributable to the value of helium beyond $3.00 per m.c.f.

In *Grounds I, supra,* this court considered contract price provisions in contracts between the United States and pipeline companies relating to volumes of contained helium following the 1960 Helium Act amendments. We referred to initial fixed prices per m.c.f. under each contract "all subject to escalation" in that in arriving at the unit prices in the Helex [companies] contracts the United States negotiated on the basis of costs comparable to those it would incur in a government-owned plant; further, included in the cost "build up" was the payment of $2.00 per m.c.f. for helium "contained in natural gas delivered at the extraction plant for processing." *Grounds I,* 441 F.2d at p. 717.

It is our view that the cost build up established that the $2.00 per m.c.f. helium payment is as applicable at the wellhead as it is at plant inlet, inasmuch as the build-up contains another provision for "shrinkage" which included all of the costs incurred by the Helex companies between the wellhead and the plant inlet. The United States

calculated the "shrinkage" over the life of each contract on a total dollar basis. These payments are not claimed by the lessee-producers. They point out, however, that their importance (the "shrinkage" payments) is in that they establish that there is no relationship between the "shrinkage" payments and the $2.00 per m.c.f. helium payment, which is over and above *all costs* upstream; and, accordingly, the $2.00 per m.c.f. payment is as applicable at the wellhead as at the plant inlet. We agree. This contention is bolstered by the evidence that in the cost "build-up" the helium payments were increased beyond the $2.00 per m.c.f. in order to relate them to the volume of crude helium at the plant outlets. This was accomplished by dividing the $2.00 by a plant efficiency factor which was less than 100%—no plant being that efficient. This process increased the helium payments made by the United States to an average of $2.38 per m.c.f. Thus, the evidence is that the Helex companies have received from the United States, through the cost "build up" factoring, an amount in excess of $2.00 per m.c.f. over and above their costs and a reasonable profit.

The United States, in its brief filed with this court in the consolidated appeals leading to *Ashland II, supra*, criticized our opinion in *Grounds I*, 441 F.2d at pp. 721, 722, wherein we rejected the Helex companies' contention that because the lessee-producers did not assume any of the risks in the construction of multi-million dollar extraction plants, they are not entitled to any payment representing the reasonable value of the helium. The United States urged us to reverse our *Grounds I* opinion to the extent that it required additional payments for commingled helium arising from the gas sales contracts. [Brief of United States, pp. 29–31]. We declined the invitation.

In *Grounds I, supra*, we made it abundantly clear that a reconciliation of the Natural Gas Act and the 1960 amendments to the Helium Act required the conclusion that FPC service rates do not apply to the subject contracts so as to deny the lessee-producers and landowners recovery for the contained helium which is processed in the Helex companies' separation plants:

> Hence, the lessee-producers recover from the fund the reasonable value of the helium content of the processed gas and they in turn must pay royalty thereon to the landowners. We believe that this result is a valid reconciliation of the statutes and a proper determination of the rights of the parties.

441 F.2d at p. 723.

In *Grounds I, supra*, we had earlier observed that if the lessee-producers must deliver the gas at the FPC service rate, based on fuel value, and thus receive nothing for the helium value, this would result in a ". . . windfall for the pipelines and their Helex subsidiaries." 441 F.2d at p. 722.

In its supplemental brief, the *Helex Group* argue that "the fact the government used $2.00 in its work-up does not constitute an admission binding upon the Helex Companies in *Grounds II* that $2.00 is a comparable value for commingled helium at the extraction inlet" and "the fact of the matter is that a $2.00 figure for contained helium has been bandied about in several different instances in connection with the value of the helium." [Supp. Brief of Helex Group, p. 9]. These statements, in our view, do not address the issue: the parties did, in contracting, recognize limits of liabilities which were certain to arise at a future date and the parties negotiated those limits.

In *Ashland I*, we observed:

> It is apparent that under the contractual arrangement, the United States undertook to pay to Phillips the amounts that Phillips "shall pay" to other parties for the acquisition of helium in the natural gas above a certain figure. This is in the nature of an indemnity agreement and the contract contains qualifications and limitations not here concerned. The United States is liable for some of the additional amounts which Phillips will have to pay. The Government has thus

entered the litigation to assert its own position and interest under the contract ... It [the United States] directed, by contracting, the diversion of the helium to itself before resolving the obvious ownership problems with a multitude of claimants having diverse legal relationships to the helium, depending upon the place where the natural gas was produced and upon their contractual positions. *The United States, again by contract, sought to handle these problems by providing for reimbursement to Phillips, and it may have done so.* The Government nevertheless obviously has the basic responsibility and liability, as it recognized by its intervention. [Emphasis supplied].

554 F.2d at p. 390.

Senate Report No. 1814 of June 30, 1960, to accompany H.R. 10548, U.S.Code Cong. & Admin.News 1960, p. 3595, Helium Act Amendments of 1960, demonstrates the Government's sense of urgency and commitment to an effective, long-range program for the production and storage of helium to assure Government needs essential to our missile and atomic energy programs and needs of the Department of Defense, the Atomic Energy Commission, the National Aeronautics and Space Administration, and other Federal agencies. The report contains the following:

> The measure provides essentially for a conservation program and envisions the possible construction of up to 12 new plants located on helium-bearing gas pipeline to extract the helium that would otherwise be wasted from the gas before the combustible gas goes to fuel markets. The helium extracted would then be stored underground in the Government-owned Cliffside gasfield near Amarillo, Tex., until needed in the future ... The legislation would provide for industry being invited to participate in the program by financing, building and operating plants to separate helium from natural gas, with the helium then being purchased and conserved by the Govern-

ment ... The legislation would provide new legal authority to make such participation by industry possible, which cannot be done under present statutes. *The long-term contracts contemplated under this Act would make it feasible for private industry to negotiate with banks and other financial institutions for the capital necessary to build separation plants. If, however, private industry should not indicate a willingness and capability to perform as a helium producer in a reasonable time, the Government could undertake the program as a Government operation* .... The authority given to the Secretary of the Interior by H.R. 10548 is therefore not limited to the implementation of this specific program presented by the Department of the Interior. It is necessarily broad and general ... [Emphasis supplied].

S.Rep. No. 1814, 86th Cong., 2nd Sess. 2 (1960), U.S.Code Cong. & Ad.News, 86th Cong., 2nd Sess., Vol. 2, pp. 3597, 3598.

Thus, we hold that $2.00 per m.c.f. is the "floor", *the minimum* to which the lessee-producers and landowners are entitled.

## IV.

The District Court ordered that the Helex companies pay unto the registry of the court on an annual basis to the nearest accounting date to January 1, 1972, "... to the Lessee-Producers and the members of the respective classes which they represent, as their interests may appear, the reasonable value of the helium as described herein, together with interest thereon at the rate of six per cent (6%) per annum from the end of each year to the date of this judgment and at a rate of eight per cent (8%) thereafter on the total of said principal amounts and said pre-judgment interest thereon, until such sums are paid into the registry of the Court." [R., Supp. Vol. I, p. 99].

In *Ashland I, supra,* this court held that the lessee-producers are entitled to

prejudgment interest. We recognized the discretion vested in the trial court in calculating and awarding such interest, *citing to Royal Indemnity Co. v. United States,* 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361 (1941) and *St. Paul Mercury Indemnity Co. v. United States,* 201 F.2d 57 (10th Cir. 1952). We hold that the trial court did not abuse its discretion in the award of prejudgment interest. Here, the liability was determined and the exact time frames were fixed during which the claims were liquidated. *Milgo Electronic Corporation v. United Business Communications, Inc.,* 623 F.2d 645 (10th Cir. 1980), *cert. denied,* 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 610; *Bruegger v. National Old Line Insurance Company,* 529 F.2d 869 (10th Cir. 1976). The denial of prejudgment interest has been termed a "handsome method" of avoiding the payment of interest on one's debts. *Bruegger, supra,* at p. 870. Here, the District Court properly found liability. Even though the judgment must be set aside for new trial on the ultimate dollar liability issue by employment of the "work back" method of valuation of the helium, the amounts due are sufficiently certain to qualify as a liquidated claim. *Seneca Nursing Home v. Secretary, Etc.,* 604 F.2d 1309 (10th Cir. 1979). This is particularly applicable here in light of our holding that the $2.00 per m.c.f. was, per contract, the agreed "floor" or minimum dollar liability and the United States and the Helex companies recognized further "contingent" dollar liabilities in claims certainly to be advanced by third parties. The unusual posture of the "taking" mandates the award of prejudgment interest on the liability to be fixed by the trial court's judgment on remand.

We expressly affirmed the award of prejudgment interest under almost identical facts and circumstances in *Ashland I, supra.* The liquidated amount doctrine does not apply to the circumstances involved in the case at bar. This is not a typical tort claim action. Prejudgment interest is contemplated where the damage awards are certain or capable of being made certain by calculation. *Jesko v. American-First Title & Trust Company,* 603 F.2d 815 (10th Cir. 1979); *Liberty National Bank & Trust Co. v. Acme Tool Division,* 540 F.2d 1375 (10th Cir. 1976). Further, we made it clear in *Ashland I, supra,* that the trial court in that case "acted within its discretion under *federal law* in the allowance of prejudgment interest." 554 F.2d at p. 392. [Emphasis supplied]. Such was predicated on our determination that in that action, as here, *Erie v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) does not apply so as to mandate, in diversity based actions, that federal courts apply the law of the state where the cause of action arose. We held, instead, that because the liabilities identified in *Ashland I,* just as here, are primarily those of the United States, the desirability for a uniform rule in similar actions brought in other states is plain. Thus, we applied the rule laid down in *Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), *i. e.,* where the rights and duties of the United States are primary and involve transactions occurring in several states, the application of state law would subject the rights and duties of the United States to uncertainties, leading to possible diverse results involving identical transactions. We recognized that the federal court, however, may apply state doctrines or parts of them as "federal law". 554 F.2d at p. 391.

· The District Court did not award attorneys' fees and costs. The court reserved the matter in that the court " . . . clearly contemplates that new applications for allowance of fees and costs will be filed after appellate review is concluded in these cases." [Supp. Vol. I, p. 104]. We observe, however, that in *Ashland I,* we set aside the trial court's award of attorney fees in that we " . . . are unable to find any statutory provision for them or any rule of practice which would authorize such fees." 554 F.2d at p. 392.

### ORDER

Thus, the judgment of the trial court is set aside as to the valuation determination.

On remand, the trial court shall undertake such further proceedings deemed necessary to enter judgment based upon the value less expense or work-back valuation, subject to the $2.00 per m.c.f. "floor" or minimum payments to which the lessee-producers and landowners are entitled as set forth in Part III of this opinion. The District Court may undertake such other proceedings deemed proper in the light of this opinion. Each party shall bear its own costs on this appeal.